**Case Nos. 25-7916, 25-7917**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION

IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION

IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Nos. 5:21-md-02985, 5:21-md-03001, 5:21-cv-02777
Hon. Edward J. Davila

---

# BRIEF OF AMICUS CURIAE OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO

---

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
HANNAH CHARTOFF, SBN 324529
Deputy City Attorneys
Fox Plaza, 1390 Market Street, 6th Floor
San Francisco, California 94102-5408
(415) 355-3323
Hannah.Chartoff@sfcityatty.org
*Counsel for Amicus Curiae*
OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO

# TABLE OF CONTENTS


INTEREST OF AMICUS .......... 1
INTRODUCTION .......... 2
ARGUMENT .......... 4

- I. Appellants Are Wrong That Section 230 Protects Their Payment Processing Conduct. .......... 4
  - A. Section 230 Was Not Intended to Shield Internet Companies from All Liability Related to Third-Party Activity .......... 4
  - B. This Court's Existing Precedent Does Not Support Treating Payment Processing As Publishing. .......... 7
    - 1. *HomeAway* Controls the Outcome Here .......... 8
    - 2. *Calise* Does Not Require Reversal. .......... 9
  - C. Appellants' Claim That the District Court's Holding Would Pose an Extraordinary Burden Is at Odds with Their Present Business Practices. .......... 11
    - 1. Apple .......... 11
    - 2. Google .......... 13
    - 3. Meta .......... 13
- II. Appellants' Expansive Reading of Section 230 Would Turn Business Transactions Into "Content" and Limit Consumer Protection Law. .......... 15
  - A. California's Broad Consumer Protection Statute Is Intended to Reach All Manner of Unlawful Business Practices. .......... 15
  - B. Treating Payment Processing As Publishing Would Shield Online Business Practices from UCL Enforcement. .......... 17
- III. If the Court Concludes Controlling Circuit Precedent Requires Reversal—Which It Does Not—It Should Recommend En Banc Review .......... 18

CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. Yahoo!, Inc.*
570 F.3d 1096 (9th Cir. 2009) ........ 7

*Calise v. Meta Platforms, Inc.*
103 F.4th 732 (9th Cir. 2024) ........ *passim*

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*
20 Cal. 4th 163 (1999) ........ 1, 15, 16, 17

*City & Cty. of S.F. v. 1449 Powell St. LLC*
Case No. CGC-23-609526 (S.F. Super. Ct.) ........ 16

*Doe 1 v. Meta Platforms, Inc.*
174 F.4th 1159 (9th Cir. 2026) ........ 5, 7, 19

*Epic Games, Inc. v. Apple Inc.*
559 F. Supp. 3d 898 (N.D. Cal. 2021) ........ 12

*Est. of Bride v. YOLO Techs., Inc.*
112 F.4th 1168 (9th Cir. 2024) ........ 5

*Ex-Human, Inc. v. Apple, Inc.*
Case No. 3:26-cv-02798-JD (N.D. Cal.) ........ 12

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*
521 F.3d 1157 (9th Cir. 2008) ........ 5, 6, 8, 15

*HomeAway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019) ........ *passim*

*People v. Gatalog Foundation, Inc.*
Case No. CGC-26-633508 (S.F. Super. Ct.) ........ 16

*People v. Rogue Holdings, LLC*
Case No. CGC-24-617804 (S.F. Super. Ct.) ........ 17

*People v. Sol Ecom, Inc.*
Case No. CGC-24-617237 (S.F. Super. Ct.) ........ 17

*People v. The Kraft Heinz Co.*
Case No. CGC-25-631189 (S.F. Super. Ct.) ........ 16

*People v. Workforce As a Service, Inc.*
Case No. CGC-24-615401 (S.F. Super. Ct.) .......................................................16

**Codes and Regulations**

United States Code, Title 47
§ 230 (Communications Decency Act, "Section 230") ................................*passim*
§ 230(a)...............................................................................................................3
§ 230(b)(2) ..........................................................................................................6
§ 230(c)...............................................................................................................7
§ 230(c)(1) ....................................................................................................4, 19

California Business and Professions Code
§ 17200 *et seq.* (Unfair Competition Law, "UCL")............................ 1, 15, 16, 17
§ 17204. ........................................................................................................1, 16

**Rules**

Federal Rule of Appellate Procedure 29(a)(4)(E) .................................................1

## INTEREST OF AMICUS[1]

The California Legislature deputized public law offices—including Amicus, Office of the City Attorney for the City and County of San Francisco—to protect consumers. The California Unfair Competition Law, Business and Professions Code section 17200 *et seq.* ("UCL"), authorizes the California Attorney General, district attorneys, and certain city attorneys and county counsels to bring actions to protect consumers on behalf of the People of California. *Id.* §17204.

The UCL is intentionally broad and agile, designed and consistently interpreted to encompass "the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999) (cleaned up). Under this authority, Amicus and other local government officers act as civil prosecutors to enforce California consumer protection law, addressing unlawful and unfair business practices across industries.

Appellants in this case ask this Court to adopt a rule that would radically constrain civil prosecutors from being able to protect consumers as the California

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus Curiae certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than Amicus Curiae contributed money that was intended to fund preparing or submitting this brief. All parties consented to the filing of this brief.

Legislature intended. Appellants would have this Court transform business transactions into "content" under the protection of Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"). Under such an unsupported and expansive reading of that statute, businesses could contrive to avoid consumer protection laws by simply moving their brick-and-mortar practices onto the internet.

Consumers rely on websites and mobile applications to seek all kinds of services: healthcare, education, banking and financial, travel planning, entertainment, and more. And Amicus and other California civil prosecutors serve as the guardians of those marketplaces, challenging unlawful business practices that harm consumers, both online and in the real world. Under Appellants' proposed rule, such online unlawful conduct would be shielded from the courts' reach. As such, Amicus has a substantial interest in this matter and offers this brief to explain the consumer harm that would result from adopting Appellants' construction of Section 230.

## INTRODUCTION

Appellants seek to transform Section 230 into something it is not. In Section 230, Congress recognized the internet's promise as a forum for "political discourse," "educational and informational resources," "cultural development," and "intellectual activity," and it created a safe haven for publishers of that content.

47 U.S.C. § 230(a). At the same time, Congress intended this section of the Communications Decency Act, which is titled "Protection for private blocking and screening of offensive material," *id.*, "to encourage internet companies to monitor and remove offensive content without fear" of liability for failing to remove *all* such offensive third-party conduct. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024).

What Section 230 does *not* do is immunize online business transactions from legal scrutiny. This case, unlike those that concern claims for hosting or moderating user-generated content, involves payment processing: a business activity that has nothing to do with content or the act of publishing. Here, Appellants process payments within social casino apps, *i.e.*, they facilitate the exchange of money for gambling tokens, which is much like the act of exchanging money for chips on a physical casino floor. No definition of "publishing" can legitimately encompass what is simply a sale.

To hold the contrary would create a nonsensical double standard differentiating between brick-and-mortar businesses and online ones. In the three decades since Section 230 was enacted, the internet has become a significant—if not the primary—marketplace for goods, financial services, education, healthcare, and more. Mobile applications, easily available on consumers' phones and offering near instant sales with consumers' stored payment information, have made

the online marketplace more accessible still. If the millions of transactions occurring in those apps were "content" and the act of processing payments for them "publishing," then all manner of unlawful business practices would flourish without consequence. Consumers would be misled, defrauded, and otherwise taken advantage of by scammers operating under the cloak of apps. And Amicus, as a civil prosecutor empowered to root out and protect consumers from such unfair practices, would be left unable to remedy them.

Amicus therefore urges the Court to affirm the district court's holding that Plaintiffs' claims premised on payment processing are not barred by Section 230.

## ARGUMENT

### I. Appellants Are Wrong That Section 230 Protects Their Payment Processing Conduct.

The key issue in this case is whether payment processing constitutes "publishing" within the meaning of Section 230(c)(1), which precludes treating internet service providers "as the publisher[s] or speaker[s] of any information provided by another information content provider." As discussed below, Appellants distort statutory intent and decisional law in an effort to use Section 230 to shield their business activities from liability.

#### A. Section 230 Was Not Intended to Shield Internet Companies from All Liability Related to Third-Party Activity.

When the internet was still in its infancy, Congress enacted Section 230 out of concern that internet platforms would face liability as traditional publishers, as

opposed to being treated as mere distributors. *Calise*, 103 F.4th at 738-39; *see also Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1175 (9th Cir. 2026) (R. Nelson, J., concurring) (explaining that the publisher-distributor distinction for purposes of speech torts developed "over centuries"). While a "'publisher' can bear tort liability for anything that it communicates, even negligently," a distributor, such as a bookstore or newspaper, "usually cannot be held liable for repeating unlawful content," unless it "knew or had reason to know that the content was unlawful." *Calise*, 103 F.4th at 739. In navigating this distinction, Congress feared internet service providers would face a "grim choice": either they would moderate or edit content, therefore becoming responsible (as a publisher) for anything tortious written on their platforms; or they would do nothing "and let the trolls run wild." *Est. of Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024).

Section 230 was Congress's answer. Under its protection, internet service providers could "perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). In other words, the statute's goal was to "bring traditional 'distributor' immunity online," even when internet companies "monitor[ed] and remove[d] offensive content." *Calise*, 103 F.4th at 739.

In Appellants' telling, Section 230 was intended to leave the internet completely "unfettered" by regulation in order to preserve "the 'vibrant and competitive free market' for online services" that existed at the time of the statute's enactment. Meta Br. at 60 (quoting 47 U.S.C. § 230(b)(2)); *see also* Google Br. at 56; Apple Br. at 29.[2] But a "free market … *for*" the internet and internet service providers, 47 U.S.C. § 230(b)(2) (emphasis added), does not equate to the absence of any regulation of business transactions *on* the internet.

A "vibrant and competitive" online market does not mean that businesses should be free to engage in unfair or illegal conduct. As this Court has explained, the statute "was not meant to create a lawless no-man's-land on the Internet." *Roommates*, 521 F.3d at 1164; *see also HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) ("Like their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations."). Instead, Section 230 "was intended to incorporate common law concepts and bring them online." *Calise*, 103 F.4th at 747 (R. Nelson, J., concurring).

Had Congress intended to provide internet platforms general immunity from liability, it could have done so, for example, by holding such companies harmless

---

[2] Amicus refers to Appellants Meta, Google, and Apple's opening briefs (Case No. 25-7916 Dkts. 27.1 and 29.1; Case No. 25-7917 Dkt. 11.1) as "Meta Br.," "Google Br.," and "Apple Br.," respectively.

for anything they "do" with third-party content. It did not. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009) ("[N]either [Section 230(c)] nor any other [subsection] declares a general immunity from liability deriving from third-party content."). The statute protects only "publishing" and "speaking"; payment processing is neither.

### B. This Court's Existing Precedent Does Not Support Treating Payment Processing As Publishing.

As this Court has recognized, Section 230 has "expanded" beyond its original purpose, "discard[ing] the longstanding distinction between 'publisher' liability and 'distributor' liability." *Doe 1*, 174 F.4th at 1170 n.5 (quoting *Calise*, 103 F.4th at 747 (R. Nelson, J., concurring)). Yet under this Court's applicable precedent, the conduct at issue in this case still cannot be construed as publishing.

For purposes of Section 230, the Ninth Circuit generally defines publishing as the act of "reviewing, editing, [or] deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. To determine whether a plaintiff's claim treats a defendant as a publisher, courts must look not merely to the defendant's conduct, but also to the plaintiff's "theory of liability," *i.e.*, "the duty that the plaintiff alleges the defendant violated." *Calise*, 103 F.4th at 740 (quoting *Barnes*, 570 F.3d at 1101-02).

Here, the district court correctly held (a) that the crux of Plaintiffs' statutory claims is whether Appellants violate consumer protection laws when they process

in-app payments for casino apps, and (b) that payment processing is not an act of publishing, rather, it is an act of collecting payments for gambling tokens and remitting a portion of those payments to the online casino. GoogleER-13-15 (Case No. 25-7916, Dkt. 28.2). The real-world equivalent to Plaintiffs' claims is that Appellants serve as the cashier's cage in a casino, brokering the exchange of money for chips to use in slot machines and retaining a substantial percentage of that money in the process. Appellants are simply facilitating a sale: the purchase of a product (digital tokens) in exchange for money.

No plausible theory could construe such conduct occurring in the real world as "publishing"; nor should it online. *See HomeAway*, 918 F.3d at 683 ("We have consistently eschewed an expansive reading" of Section 230 "that would render unlawful conduct 'magically lawful when conducted online.'" (quoting *Roommates*, 521 F.3d at 1164) (cleaned up)).

**1. *HomeAway* Controls the Outcome Here.**

Notwithstanding Appellants' contentions, *see* Apple Br. at 47-50; Google Br. at 34-36; Meta Br. at 47-49, this Court's decision in *HomeAway* is precisely on point. There, as here, the prohibited business practices at issue were sales—the short-term letting of unregistered properties—that could transpire online or in the real world. *HomeAway*, 918 F.3d at 680, 683. There, as here, the business asserted that because it would have to engage in "monitoring" of property listings

to ensure each was in the local registry, such activity warranted Section 230 immunity. *Id.* at 682. And there, as the Court should here, the Ninth Circuit rejected such a "broad" reading: "To provide broad immunity every time a website uses data initially obtained from third parties would eviscerate [Section 230]." *Id.* at 682 (cleaned up). Instead, "[a]s with tax regulations or criminal statutes," the duty imposed on internet companies "fairly charge[d] [them] with keeping abreast of the law" and did not "run[] afoul of" Section 230. *Id.* at 683.

The duty here is no different. Appellants must simply refrain from processing payments for transactions that violate state consumer protection or gambling laws. That duty applies equally to all payment processors, regardless of whether they also operate online stores.

**2. *Calise* Does Not Require Reversal.**

Appellants wrongly suggest that this Court's recent decision in *Calise*, 103 F.4th 732 (9th Cir. 2024), requires reversal because *Calise*—as Appellants' argue—holds that Section 230 applies any time a defendant could avoid liability by monitoring third-party content. *See* Apple Br. at 37; Google Br. at 24-25; Meta Br. at 56-57. Not so.

For one thing, *Calise* expressly recognizes: "That some monitoring of content … may be required" is not enough for Section 230 to apply. 103 F.4th at 741 (citing *HomeAway*, 918 F.3d at 682). The Court explained that the Section

230 analysis is not a "rudimentary fact-bound inquiry" that looks only at a defendant's conduct, *i.e.*, does it monitor or not. *Id.* at 742.

Instead, *Calise* requires a court first to determine what "duty" the plaintiff's theory of liability imposes on a defendant and whether that duty "springs … from the defendant's status as a publisher" or from something separate. *Id.* Only if the duty does not spring "from obligations the defendant has in a different"—*i.e.*, non-publisher—"capacity" does the court go on to consider whether that duty obliges the defendant to monitor third-party content. *Id.*

This distinction is made clear by the court's different treatment of the *Calise* plaintiffs' contract and non-contract claims. *Id.* at 742-43. Plaintiffs in *Calise* alleged that the defendant, Meta, breached a promise made in the Meta Terms of Service "to 'take appropriate action' to combat scam advertisements." *Id.* at 743. Of course, Meta could have avoided liability by actually monitoring third-party advertisements, as promised. *Id.* But that did not matter, because Meta was "bound by a contractual duty separate from its status as a publisher." *Id.* In contrast, the *Calise* court determined that the non-contract claims imposed duties that "touche[d] on quintessential publishing conduct"—specifically, hosting third-party advertisements—and therefore were barred by Section 230. *Id.* at 744.

Here, Plaintiffs' claims are not based on any duty related to "publishing" conduct. They are based on Appellants' conduct as payment processors—

collecting money for unlawful gambling transactions. The duty to refrain from brokering unlawful transactions does not spring from Appellants' status as publishers, it arises from Appellants' distinct role as a payment processor for in-app purchases. The fact that Appellants may need to "consider" what is being purchased before they process those payments is irrelevant. *See id.* at 742 (rejecting Meta's argument that Section 230 prohibits platforms from being required to "consider" third-party content). As such, Section 230 does not apply.

### C. Appellants' Claim That the District Court's Holding Would Pose an Extraordinary Burden Is at Odds with Their Present Business Practices.

In attempting to find cover under Section 230, Apple, Google, and Meta each argue that the district court's denial of immunity would impose an unworkable monitoring burden on its platform. Those claims are inconsistent with the public record showing Appellants' considerable involvement in vetting and ensuring apps in their stores, as well as content in the apps, comply with federal and state law. The Court therefore should not credit Appellants' burden claims as a basis for reversal.

#### 1. Apple

Apple argues that the only way for it to determine whether it is lawful to process a payment for in-app activity would be to monitor third-party content to see what is being sold and how it can be used in an app. Apple Br. at 37-38.

Apple further claims that the required monitoring would be "continuous," "all-encompassing," "pervasive," and "extraordinarily burdensome." *Id.* at 38-39.

But according to Apple's own statements in antitrust litigation, it already engages in a comprehensive human review process of all apps in its app store. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1003-07 (N.D. Cal. 2021).

Apple's own developer guidelines and agreements further outline the extent of its existing monitoring. Specifically, in its "Developer Program License Agreement," Apple requires app developers to "submit to Apple for review and approval all content, functionality, or services" to be provided to consumers "through the use of the In-App Purchase API."[3] Apple's "App Review Guidelines" further state that "all … software offered in" an app, including "mini games" and "plug-ins," must comply with Apple's Guidelines and "all applicable laws," and that apps that fail to comply with the Guidelines will be rejected.[4] Apple's testimony in another recent lawsuit confirms that Apple in fact engages in this review and pulls apps from its store if they fail Apple's vetting process.[5]

---

[3] Apple, "Developer Program License Agreement," Attachment 2 ("Additional Terms for Use of In-App Purchase API") at § 1.2, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/#A2 [https://perma.cc/5VSP-Z4JL].

[4] Apple, "App Review Guidelines" at § 4.7, available at https://developer.apple.com/app-store/review/guidelines [https://perma.cc/QZ78-BMTB].

[5] *See Ex-Human, Inc. v. Apple, Inc.*, Case No. 3:26-cv-02798-JD, at Dkts. 30-5 & 30-6 (N.D. Cal. May 1, 2026) (including correspondence between app developer and Apple App Review Board).

### 2. Google

Google similarly contends that the district court's conclusion would require it to engage in monitoring across "millions of apps … and the millions of transactions within those apps" and that such monitoring "would not be straightforward." Google Br. at 27-28.

Like Apple, Google's Developer Program Policy confirms that it undertakes both "human and automated evaluation to review apps and app content" and that Google may "reject[]" "new app[s] or app update[s] submitted for review" if its policies are violated.[6] And Google already requires additional documentation to be submitted for some categories of apps, including apps providing financial services (requiring submission of a "Financial features declaration form")[7] and gambling apps (requiring a separate application in order to distribute the app).[8]

### 3. Meta

Finally, Meta decries the burden it would face if the district court decision were affirmed, specifically, that it would be required to "analyz[e] the particulars

[6] Google, Play Console Policy Center, "Developer Program Policy: Enforcement" (effective May 27, 2026), available at https://support.google.com/oogleplay/android-developer/answer/17105854?hl=en&ref_topic=9877065&sjid=1599369462187343168-NC [https://perma.cc/XN4L-SCW9].

[7] Google, Play Console Policy Center, "Restricted Content: Financial Services," available at https://support.google.com/googleplay/android-developer/answer/9876821?hl=en&ref_topic=9877466 [https://perma.cc/YZ8X-3AU8].

[8] Google, Play Console Policy Center, "Restricted Content: Real-Money Gambling, Games, and Contests," available at https://support.google.com/googleplay/android-developer/answer/9877032 [https://perma.cc/2S6L-GMUV].

of the gameplay" in "the myriad apps currently hosted on Facebook." Meta Br. at 53.

But Meta's own policies indicate that it already conducts such a review of apps on its platform. According to Meta, an app "must first undergo App Review" before it can be used by the general population of Facebook users.[9] As part of that review process, developers must give access to every permission and component requested. If Meta "cannot test functionality that requires a specific permission or feature that [the developer is] requesting, [the developer] will not be approved for that permission or feature."[10] Specifically, apps are only "eligib[le]" to use Facebook Payments if Meta "approve[s]" the developer's request "at [Meta's] sole discretion."[11] What is more, apps are only allowed to administer promotions "in which a user's purchase of in-game items or virtual currency contributes to or results in eligibility to win any prize of value" if Meta grants permission after review of "an opinion letter from [the app's] legal counsel that explains why [the] game does not constitute gambling."[12]

---

[9] Meta, "Responsible Platform Initiatives: App Review," available at: https://developers.facebook.com/documentation/resp-plat-initiatives/individual-processes/app-review [https://perma.cc/SJ2R-W3XC].

[10] *Id.*

[11] Meta, Facebook Payment Terms § 1.1 (last revised Nov. 4, 2022), available at: https://developers.facebook.com/policy/payments_terms [https://perma.cc/8D7Z-V9ZM].

[12] *Id.* at § 1.4.7.

*   *   *

In sum, each Appellant appears to already conduct the very monitoring they complain of as unduly burdensome. And in any event, that monitoring is insufficient to turn their payment processing conduct into publishing. Under the Court's precedents, Section 230 does not apply to the claims at issue in this appeal.

## II. Appellants' Expansive Reading of Section 230 Would Turn Business Transactions Into "Content" and Limit Consumer Protection Law.

As this Court has explained, Section 230 cannot be construed as a tool to transform unlawful conduct into something "magically lawful when conducted online." *HomeAway*, 918 F.3d at 683 (quoting *Roommates*, 521 F.3d at 1164 (cleaned up)). But Appellants' theory that payment processing is publishing, shielded by Section 230, does just that. Such an expansion of Section 230 risks turning in-app payment processing into a safe haven for illegal business practices, beyond the reach of California consumer protection law.

### A. California's Broad Consumer Protection Statute Is Intended to Reach All Manner of Unlawful Business Practices.

The UCL, which prohibits unfair competition, Cal. Bus. & Prof. Code § 17200 *et seq.*, is sweeping and flexible, and courts have consistently interpreted it to be so. *E.g.*, *Cel-Tech*, 20 Cal. 4th at 180. The statute prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.* (citation omitted). A violation of any "other law[]" may be "independently actionable" under the UCL as an "unlawful" business practice, and

the statute prohibits "unfair" and "deceptive" practices as well, even if not specifically proscribed. *Id*. (citation omitted). The California Legislature intended the UCL to be read broadly, "since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." *Id.* at 181 (citation omitted).

Civil prosecutors, like Amicus, are empowered to bring UCL actions in the name of the People of the State of California, and they can seek and secure statewide injunctive relief, civil penalties, and restitution for the benefit of all California consumers. Cal. Bus. & Prof. Code § 17204. Consistent with the statute's broad scope, Amicus has used its authority to protect consumers in a wide variety of contexts: against companies who misclassify workers, *People v. Workforce As a Service, Inc.*, Case No. CGC-24-615401 (S.F. Super. Ct.); against distributors of 3D-printed gun blueprints, *People v. Gatalog Foundation, Inc.*, Case No. CGC-26-633508 (S.F. Super. Ct.); against landlords who profit off of unsafe SRO units, *City & Cty. of S.F. v. 1449 Powell St. LLC*, Case No. CGC-23-609526 (S.F. Super. Ct.); and against manufacturers of addictive ultraprocessed foods, *People v. The Kraft Heinz Co.*, Case No. CGC-25-631189 (S.F. Super. Ct.).

Online business conduct is no less capable of causing harm to consumers than transactions in traditional brick-and-mortar storefronts. If anything, the internet makes it easier for unfair business practices to reach consumers in

California. A scammer no longer needs to be in the same room as a consumer to mislead them into a faulty purchase; they need not even be in the same state.

The UCL is intended to cover these "scheme[s]" as well, even if the scammers' methods are "original." *See Cel-Tech*, 20 Cal. 4th at 181 (citation omitted). Indeed, Amicus currently uses its authority to protect consumers from unlawful business activities online. *E.g.*, *People v. Rogue Holdings, LLC*, Case No. CGC-24-617804 (S.F. Super. Ct.) (UCL action against online tobacco sellers who illegally sell flavored nicotine); *People v. Sol Ecom, Inc.*, Case No. CGC-24-617237 (S.F. Super. Ct.) (UCL action against companies that allow creation of deepfake pornography of real women and girls).

### B. Treating Payment Processing As Publishing Would Shield Online Business Practices from UCL Enforcement.

If processing the payment for an online transaction can be recast, in "the creative nature of [a] scheming mind," *Cel-Tech*, 20 Cal. 4th at 181 (citation omitted), as "content" protected by Section 230—as Appellants ask this Court to hold—then a variety of marketplace activities would be immune from the UCL.

This is a dangerous slippery slope. Consider an app that allows users to purchase illegal merchandise, *e.g.*, narcotics. Or an app that allows purchase of an in-app coupon redeemable for narcotics at a given location. If Apple were to process payments for the sale of narcotics—either through an in-app coupon or otherwise—would it be functioning as a publisher? Similarly, consider an app that

allows users to purchase stolen credit card information. Or an app that facilitates the purchase of malware products. Would Google, in processing payments for the sale of stolen identities or other illegal material, be functioning as a publisher?

According to Appellants' theory, the answer to each of these questions would be yes, so long as the in-app narcotics coupon or stolen identity information was provided by someone other than them. Under their rule, Appellants' act of processing payments for such items is merely "publishing" third-party "content," and they would be entitled to immunity under Section 230 from any UCL lawsuit Amicus or another public prosecutor might bring. Consumers would be vulnerable to an expansive swath of unfair conduct online—now "magically lawful"—while internet platforms like Appellants profited from their losses.

But that cannot be the law. When an entity facilitates (in person or online) the sale of stolen credit card numbers (in printed hard copy or digital soft copy), they act as payment processors, not publishers. This Court should reject Appellants' invitation to hold otherwise.

## III. If the Court Concludes Controlling Circuit Precedent Requires Reversal—Which It Does Not—It Should Recommend En Banc Review.

As explained above, the district court's decision is squarely supported by *HomeAway*, and the Court should affirm on that ground. *See supra* at 8-9.

Alternatively, the Court should consider en banc proceedings to recalibrate the Circuit's test for application of Section 230, as recently suggested by multiple

judges. *E.g.*, *Calise*, 103 F.4th at 747-48 (R. Nelson, J., concurring) ("In a world ever evolving and with artificial intelligence raising the specter of lawless and limitless protections under § 230(c)(1), we should revisit our precedent and ensure we have grounded its application."); *Doe 1*, 174 F.4th at 1174 (Berzon, J., concurring) (joined by W. Fletcher, J.) (noting that recent cases have "cast this Court's unfettered expansion of section 230 into … doubt" and "underscore the necessity for *en banc* review").

## CONCLUSION

For the foregoing reasons, Amicus urges the Court to affirm the district court's ruling and find that Plaintiffs' claims premised on payment processing are not barred by Section 230.

Dated: July 17, 2026

Respectfully submitted,

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
DAVID S. LOUK
HANNAH CHARTOFF
Deputy City Attorneys

By: *<u>/s/ Hannah Chartoff</u>*
HANNAH CHARTOFF
Deputy City Attorney

Counsel for *Amicus Curiae*
OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7916, 25-7917

I am the attorney or self-represented party.

This brief contains 4,219 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☒ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

- ☐ it is a joint brief submitted by separately represented parties;
- ☐ a party or parties are filing a single brief in response to multiple briefs; or
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _________.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature *s/ Hannah Chartoff* Date July 17, 2026

*(use "s/*[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# CERTIFICATE OF SERVICE

I, CHRISTINE HOANG, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on July 17, 2026.

**BRIEF OF AMICUS CURIAE OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed July 17, 2026, at San Francisco, California.

*/s/ CHRISTINE HOANG*
CHRISTINE HOANG