**Nos. 25-7916 and 25-7917**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION

IN RE GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION

IN RE FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION

On Appeal from the United States
District Court for the Northern District of California
Nos. 5:21-cv-2777, 5:21-md-3001
The Honorable Edward J. Davila, District Court Judge

# BRIEF OF THE ELECTRONIC PRIVACY INFORMATION CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEES AND AFFIRMANCE

Megan Iorio
Tom McBrien
Hayden Davis
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

July 17, 2026

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* the Electronic Privacy Information Center states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... I
TABLE OF CONTENTS .......................................... II
TABLE OF AUTHORITIES .......................................... III
INTEREST OF THE *AMICUS CURIAE* .......................................... 1
SUMMARY OF THE ARGUMENT .......................................... 2
ARGUMENT .......................................... 4
I. Section 230 only prevents claims that would force internet companies into the moderator's dilemma .......................................... 4
A. Congress enacted Section 230 to prevent the moderator's dilemma .......................................... 6
B. The Ninth Circuit has cabined Section 230 to claims that would cause the moderator's dilemma .......................................... 12
1. A duty does not result in the moderator's dilemma unless it necessarily requires the exercise of editorial control over unlawful content .......................................... 15
2. A duty does not result in the moderator's dilemma unless it springs from publishing conduct .......................................... 20
3. *Doe v. Twitter* does not establish that either criterion is sufficient on its own for Section 230 protection .......................................... 23
II. Plaintiffs' claims do not force Defendants into the moderator's dilemma .......................................... 27
A. The claims in this case do not require app stores to exercise editorial control over third-party content .......................................... 28
B. The source of the Defendants' alleged duties is their processing of payments, not any publishing conduct or status .......................................... 29
III. Denying Section 230 protections here will not break the internet .......................................... 31
CONCLUSION .......................................... 36
CERTIFICATE OF COMPLIANCE .......................................... 37
CERTIFICATE OF SERVICE .......................................... 38

# TABLE OF AUTHORITIES

## Cases

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... passim

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... passim

*Cubby, Inc. v. CompuServe, Inc.*,
776 F. Supp. 135 (S.D.N.Y. 1991) .......... 9

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......... passim

*Doe v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) .......... passim

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......... 5, 12, 30

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .......... passim

*Lemmon v. Snap*,
995 F.3d 1085 (9th Cir. 2021) .......... passim

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
No. 31063/94, 1995 WL 323710
(N.Y. Sup. Ct. May 24, 1995) .......... 7, 8, 9

## Statutes

47 U.S.C. § 230(c) .......... 6, 11

## Other Authorities

141 Cong. Rec. 16024–25 (June 14, 1995) .......... 10, 11

141 Cong. Rec. 22,045 (daily ed. Aug. 4, 1995) .......... 11

141 Cong. Rec. H8,470 (daily ed. Aug. 4, 1995) ...................................... 11

*App Review Guidelines*, Apple (last updated June 8, 2026)................... 35

Brent Skorup & Jennifer Huddleston, *The Erosion of Publisher Liability in American Law, Section 230, and the Future of Online Curation*, 72 Okla. L. Rev. 635 (2020) ............................................................ 8

Letter from Kenneth E. Swab, Senior Fed. Gov't Rels. Officer, to Jennifer J. Johnson, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., (Dec. 12, 2007) ........................................................................... 34

Olivier Sylvain, *Platform Realism, Informational Inequality, and Section 230 Reform*, 131 Yale L.J. Forum 475 (2021) ......................... 13

S. 652, 104th Cong. § 402(a)(2) ................................................................ 10

## INTEREST OF THE *AMICUS CURIAE*

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues.[1] EPIC has filed many *amicus* briefs on the scope of Section 230 immunity.[2]

---

[1] All parties consent to the filing of this brief. In accordance with Rule 29, the undersigned states that no party or party's counsel authored this brief in whole or in part nor contributed money intended to fund the preparation of this brief. No outside person contributed money intended to fund the preparation of this brief.

[2] *Section 230 & Platform Accountability*, EPIC, https://epic.org/issues/platform-accountability-governance/section-230-and-platform-accountability/.

## SUMMARY OF THE ARGUMENT

The Ninth Circuit's touchstone for determining the scope of Section 230's protections is preventing the "moderator's dilemma"—the speech-endangering phenomenon to which Congress was responding when it passed Section 230. The Ninth Circuit's interpretation of Section 230—specifically, its analysis of prong two of the *Barnes v. Yahoo!* test—tracks the moderator's dilemma closely, applying Section 230 when a claim would force interactive computer service providers into it and denying protection when a claim would not. Understanding what the moderator's dilemma is and how Section 230 prevents it is crucial for deciding the critical questions in this case about the proper scope of the statute's coverage.

The moderator's dilemma occurs when an internet company's decision to moderate some user-generated content on their platform results in a duty to ensure that the platform contains no unlawful content. To mitigate their liability risk, companies must choose to either proactively monitor and remove all potentially offending content, forego content moderation altogether, or stop hosting user-generated content. All options are bad for the online speech environment.

In the early days of the internet, a court decision in an online defamation case threatened to impose the moderator's dilemma on platforms that host user-generated content. Congress recognized that tying a beneficial practice (content moderation) to heightened liability risk (strict liability for all user-generated content) would discourage content moderation and otherwise harm the online speech environment. Congress passed Section 230 with the specific and limited purpose of preventing claims that would force internet companies into the moderator's dilemma.

The Ninth Circuit has captured this principle in its interpretation of prong two of the *Barnes v. Yahoo!* test: A claim does not "treat" the provider of an online service "as the publisher" of user-generated content unless it alleges (1) the provider has a duty to monitor all user-generated content and remove any tortious or otherwise illegal materials to escape liability, and (2) the duty springs from the provider's status or conduct as a publisher.

A claim is not prohibited by Section 230 unless it satisfies both of these criteria. It is only when both conditions are met that the duty underlying the claim resembles the kind of publisher (and distributor)

duties in defamation law that can lead to the moderator's dilemma. In all other circumstances, a defendant will have options to avoid liability outside those available in the moderator's dilemma.

Denying Section 230 protections in this case will not destroy speech and innovation on the internet. This Court's refusal to expand Section 230's scope in various other cases has not resulted in the dire consequences industry forewarned. The real danger to the internet is in widely immunizing harmful, avoidable behavior from some of society's most powerful corporations.

## ARGUMENT

### I. Section 230 only prevents claims that would force internet companies into the moderator's dilemma.

The moderator's dilemma is the undesirable situation in which the risk of civil liability forces internet companies to remove all unlawful user-generated content, remove none, or stop hosting user-generated content entirely. None of the outcomes of this "grim choice" are desirable, *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 684 (9th Cir. 2019), and so Congress enacted Section 230 with the "principal or perhaps the only purpose" of preventing it. *Fair Hous.*

*Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 n.12 (9th Cir. 2008) (en banc).

The Ninth Circuit has consistently applied Section 230 in a way that gives effect to this purpose, using Section 230 to block actions that would force companies into the moderator's dilemma, and finding the statute inapplicable to actions that would not. The Court has operationalized this limitation on Section 230's scope through its test for prong two of the *Barnes v. Yahoo!, Inc.* analysis. Under this test, Section 230 does not apply unless a claim alleges *both* (1) that an internet company has a duty to monitor and remove user-generated content (required action criterion), *and* (2) that this duty springs solely from the company's decision to publish or moderate user-generated content (source criterion). *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009). If a claim does not satisfy both criteria, it does not force a company into the moderator's dilemma and is not blocked by Section 230.

While Defendants cite to the applicable Ninth Circuit cases articulating this two-part test, most notably *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), they ignore the moderator's dilemma

entirely and instead rely on dicta from *Doe v. Twitter, Inc.*, 148 F.4th 635 (9th Cir. 2025), to incorrectly claim that (1) a duty that requires monitoring third-party content is sufficient to meet the required action criterion; and (2) meeting *either* criterion is sufficient for Section 230 to apply. This is inconsistent with the text and purpose of Section 230, and with Ninth Circuit caselaw. It is not enough that a claim would require a company merely to monitor content; the company must be required to not publish certain content as well. Even then, for that claim to truly treat the company as a publisher, it must originate from the company's role as a publisher, rather than some other source, such as a contract or—in this case—processing payments for illegal conduct.

### A. Congress enacted Section 230 to prevent the moderator's dilemma.

Section 230(c)(1) prevents an interactive computer service from being treated as the "publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). To understand the meaning of these terms, it is important to consider the "'backdrop against which Congress enacted'" the statute. *Calise*, 103 F.4th at 738 (quoting *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487 (2005)).

Congress passed Section 230 in response to a defamation case that treated an internet service provider as the "publisher," rather than the "distributor," of user-generated content. *Id.* at 739 (discussing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710, at *4 (N.Y. Sup. Ct. May 24, 1995)). "Publisher" has an established meaning in tort law, and courts "must presume that when Congress uses common-law terms, it intended to incorporate their well-settled meanings." *Id.* at 738. In tort law, a publisher can be held liable "for anything it communicates, even negligently, to a third party." *Id.* at 739 (citing Restatement (Second) of Torts §§ 577 cmt. a, 630 (Am. L. Inst. 1938)); *see also Prodigy*, 1995 WL 323710, at *3. Publishers thus have a duty to monitor for and avoid disseminating tortious materials at common law. Distributors, on the other hand, can only be held liable if a plaintiff establishes that the defendant knew they were disseminating tortious material. *Calise*, 103 F.4th at 739 (citing Restatement (Second) of Torts § 581).

The key distinction between a publisher and a distributor is the level of editorial control the entity exerts over the content it disseminates. Newspapers are traditionally treated as publishers of

their news articles and op-eds because they exert high levels of editorial control over those materials. *See Prodigy*, 1995 WL 323710, at *4. Newsstands and libraries, on the other hand, are typically treated as distributors because they are not involved in deciding the content of the publications they disseminate. *See id.* That means that distributors, unlike publishers, cannot reasonably vet the contents of every publication they distribute. Thus, if improperly subjected to the same strict liability as a publisher, a distributor's only option to avoid liability would be to steer away from disseminating anything involving controversial topics, publishers, or speakers. *See* Brent Skorup & Jennifer Huddleston, *The Erosion of Publisher Liability in American Law, Section 230, and the Future of Online Curation*, 72 Okla. L. Rev. 635, 643–49 (2020). In other words, they would be forced into the overly censorial choice in the moderator's dilemma.

In the early days of the internet, courts had to decide whether websites that hosted tortious user-generated content should be treated as publishers or as distributors of that content. One court recognized that websites that declined to alter or remove any user-generated content should be treated as distributors because they were not

exercising editorial control. *See Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 140 (S.D.N.Y. 1991). But in *Stratton Oakmont v. Prodigy Services*, another court treated an internet service provider, Prodigy, as a publisher because it promulgated and enforced content guidelines, such as bans on obscenity, on its bulletin boards. *Prodigy*, 1995 WL 323710, at *2. The court found that Prodigy's decision to moderate content rendered it a publisher, meaning the company had a duty to monitor for and remove tortious materials on its platform. *Id.* at *4; *see also Calise*, 103 F.4th at 739 (discussing the *Prodigy* decision).

The combination of the outcomes in *CompuServe* and *Prodigy* created the moderator's dilemma: to avoid massive tort liability, a website that wished to host user-generated content had to choose between foregoing content moderation altogether or adopting an onerous process of monitoring, editing, and removing any possibly unlawful user-generated content. This disincentivized content moderation and the hosting of user-generated content.

The *Prodigy* decision sent shockwaves through the ongoing Congressional debate over the Communications Decency Act ("CDA")—the law that would eventually include Section 230. Senators Exon and

Coats recognized that, by imposing content moderation obligations on websites, the CDA could risk turning all websites into publishers with dangerously high liability risks. *See* 141 Cong. Rec. 16024–25 (June 14, 1995). They added several defenses to the CDA, such as section (f)(4), which would ensure that compliance with the CDA would not, alone, cause an internet company to be treated as a publisher. *See* S. 652, 104th Cong. § 402(a)(2) (adding § 223(f)(4)) (1995) (codified at 47 U.S.C.A. § 223(f)(1) (West)).

The following exchange illustrates the Senators' intent and includes an example of a contemporaneous use of the phrase "treat" as a "publisher" of user-generated content to mean imposing a publisher's duty to remove all tortious content from the platform:

> Mr. COATS. I understand that in a recent N.Y. State decision, Stratton Oakmont versus Prodigy, the court held that an online provider who screened for obscenities was exerting editorial content control. This led the court to treat the online provider as a publisher, not simply a distributor, and to therefore hold the provider responsible for defamatory statements made by others on the system. I want to be sure that the intent of the amendment is not to hold a company who tries to prevent obscene or indecent material under this section from being held liable as a publisher for defamatory statements for which they would not other-wise have been liable.
>
> Mr. EXON. Yes; that is the intent of the amendment.

> Mr. COATS. And am I further correct that the subsection (f)(4) defense is intended to protect companies from being put in such a catch-22 position? If they try to comply with this section by preventing or removing objectionable material, we don't intend that a court could hold that this is assertion of editorial content control, such that the company must be treated under the high standard of a publisher for the purposes of offenses such as libel.
>
> Mr. EXON. Yes; that is the intent of section (f)(4).

141 Cong. Rec. 16024–25 (emphasis added).

Representatives Cox and Wyden were similarly concerned that *Prodigy* would disincentivize "Good Samaritan" companies from voluntarily moderating content and developing filtering technologies that would enable parents to control what their children saw online. They titled Section 230, their amendment to the CDA, "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material." *See* 47 U.S.C. § 230(c). Rep. Cox explained that he sought to protect "computer Good Samaritans from taking on liability such as occurred in the *Prodigy* case in New York." 141 Cong. Rec. H8,470 (daily ed. Aug. 4, 1995). The representatives were aware that *Prodigy*'s outcome—imposing a publisher's duty on websites because they moderated content—would be "a massive disincentive" to content moderation. 141 Cong. Rec. 22,045 (daily ed. Aug. 4, 1995) (statement of Rep. Cox).

Thus, the purpose of Section 230 was "to help the internet grow" into a vibrant forum for user speech and to "encourage internet companies to monitor and remove offensive material without fear that they would 'thereby becom[e] liable for all defamatory or otherwise unlawful messages that they didn't edit or delete.'" *Calise*, 103 F.4th at 739 (quoting *Roommates.com*, 521 F.3d at 1163).

### B. The Ninth Circuit has cabined Section 230 to claims that would cause the moderator's dilemma.

To avoid turning Section 230 into a "limitless" immunity from liability, *Calise*, 103 F.4th at 739 (quoting *Barnes*, 570 F.3d at 1100), the Ninth Circuit has cabined Section 230 to claims that would lead to the moderator's dilemma. Starting in *Roommates*, the Court has used the moderator's dilemma as a tool for distinguishing between claims that warrant Section 230 protection and those that do not. 521 F.3d at 1170 (noting that one claim to which Section 230 did not apply "[stood] in stark contrast to *Stratton Oakmont*" as Roommates was "not being sued for removing some harmful messages while failing to remove others"); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851–52 (9th Cir. 2016); *HomeAway*, 918 F.3d at 684.

The *Barnes* Court formalized the role of the moderator's dilemma in the Ninth Circuit's interpretation of Section 230 by requiring a defendant to show that a claim imposes a publishing *duty* on a defendant. *Barnes*, 570 F.3d at 1102–03; *see* Olivier Sylvain, *Platform Realism, Informational Inequality, and Section 230 Reform*, 131 Yale L.J. Forum 475, 497–500 (2021). According to Ninth Circuit precedent, publisher duties include those duties that are analogous to either a publisher *or* a distributor duty under defamation law that forces an intermediary to *not publish* certain user-generated content based on its mere publishing of the content or a moderation activity. *See Barnes*, 570 F.3d at 1103. These kinds of distributor duties force intermediaries into a situation analogous to the moderator's dilemma: remove offending content, abandon the moderation activity that led to the duty to remove the content, or stop publishing user-generated content altogether.

Generally, under prong two of the *Barnes* test, a claim "treats" a company "as the publisher" of user-generated content by "look[ing] to the legal duty" underlying the claim and "examin[ing] two things." *Calise*, 103 F.4th at 742. The first is whether satisfying the duty "necessarily require[s] an internet company to monitor user-generated

content" and to edit or remove offending content. *HomeAway*, 918 F.3d at 682; *see also Calise*, 103 F.4th at 742. This is the required action criterion, the purpose of which is to identify duties that force companies to ensure that they do not publish unlawful content. The second is whether the source of the duty—"the 'right' from which the duty springs"—is the defendant company's decision to host or moderate user-generated content. *Calise*, 103 F.4th at 742. This is the source criterion, the purpose of which is to identify duties that automatically attach to the hosting or moderation of user-generated content and are thus unavoidable unless the company abandons this conduct.

When both the required action and source criteria are met, this two-part analysis effectively identifies duties that are functionally equivalent to the kinds of duties imposed on publishers (and distributors) under defamation law that would force an online intermediary into the moderator's dilemma. By contrast, where either of these prerequisites is not met—for instance, if the duty can be satisfied without monitoring, editing, or removing content, or if the duty springs from "something separate from the defendant's status as a publisher," like a contractual agreement, *see id.* (citing *Barnes*, 570 F.3d at 1107;

*Lemmon v. Snap*, 995 F.3d 1085, 1092 (9th Cir. 2021))—the duty would not force the company to choose between one of the options in the moderator's dilemma and Section 230 does not provide protection.

#### 1. A duty does not result in the moderator's dilemma unless it necessarily requires the exercise of editorial control over unlawful content.

The required action criterion recognizes an uncontroversial fact: a claim only treats a defendant as a publisher of unlawful third-party content if it imposes liability for *publishing* that content. *HomeAway*, 918 F.3d at 683 (noting that "publication" of content is Section 230's concern). The only way a defendant can avoid publishing unlawful content is to exercise editorial control over that content—to monitor for it and to edit, remove, or otherwise refrain from publishing it. If a claim imposes a duty that would require the defendant to engage in these activities, it indicates that the claim targets the publishing of the content and may force intermediaries into the moderator's dilemma. By contrast, if an intermediary can satisfy the duty underlying a claim while leaving the third-party content at issue published on the intermediary's platform, the claim cannot cause the speech-stultifying effects that Section 230 was meant to protect against. For this reason,

the required action criterion is a necessary condition for Section 230 protection.

The Ninth Circuit has repeatedly held that a publisher's duty must require an intermediary to *not publish* offending content, either by removing that content, editing it, or setting up systems to proactively discover and unpublish all instances of it. *Barnes*, 570 F.3d at 1103 (duties underlying both claims required "removal of material from publication."); *Internet Brands*, 824 F.3d at 851–52 (Section 230 protects against "liability for failure to remove offensive content"); *HomeAway*, 918 F.3d at 682–83; *Lemmon*, 995 F.3d at 1092 (duty to not release content filter could be satisfied "without altering the content that Snapchat's users generate."); *Calise,* 103 F.4th at 744 (barring a claim for unjust enrichment for publishing scam ads because it held the defendant liable for "fail[ing] to remove the ads," and avoiding this liability would have required the defendant to "actively vet and evaluate third-party ads."); *Twitter*, 148 F.4th at 643, 645, 647 (only barring claims whose underlying duties would force the defendant to "remove" user-generated content); *id.* at 645, 648 (refusing to bar one claim that could be satisfied "without monitoring, removing, or in any

way engaging with third-party content" and another claim because it would not require the defendant to "monitor content nor take any action associated with publication (e.g., removal)").

*HomeAway* makes clear that monitoring third-party content is only relevant to the required action inquiry insofar as it is necessary for exercising editorial control over illicit content. The home rental platforms challenging the ordinance argued that they would need to monitor some information generated by others, including a list of licensed bookings and the transactions users generated when they tried to book a third-party listing. *HomeAway*, 918 F.3d at 682. The *HomeAway* court clarified that that these were not the kinds of monitoring activities referenced in precedent. A duty to monitor implicates Section 230 only when that monitoring relates to the "'publication' of third-party content." *Id.* at 682–83. When the monitoring is unrelated to the exercise of "editorial control," Section 230 does not apply. *Id.* at 683.

The moderator's dilemma helps to explain this result. Requiring a platform company to monitor third-party content—even when that content is published on the company's platform—does not force a

company to aggressively moderate users' speech, abandon their content moderation, or stop hosting user-generated content. It is only when the duty requires the company to *unpublish* that content that a company may be compelled to stifle users' speech.

Meeting the required action criterion is a necessary condition for Section 230 protection. The Court in *HomeAway* implicitly understood the required action criterion to be a necessary condition. The Court only analyzed this criterion and, finding it not met, concluded that Section 230 did not apply. *HomeAway*, 918 F.3d at 681–83. Similarly, the Court in *Twitter* also treated the required action criterion as necessary, finding that Section 230 did not apply to a products liability claim or a claim that the defendant violated a duty to report known child sexual abuse materials ("CSAM") simply because the claims did not require monitoring or removal of user-generated content. *Twitter*, 148 F.4th at 645, 648. The Court in *Lemmon* essentially made the same move, understanding that, when a duty underlying a claim does not require "altering the content" of users, it is evidence that the source of the duty is not the company's publishing of user-generated content. *Lemmon*, 995 F.3d at 1092.

If a claim does not necessarily require the exercise of editorial control, the claim does not seek to hold the defendant liable for publishing user-generated content, but rather for some other conduct, like failing to warn users of a known threat to their safety, *Internet Brands*, 824 F.3d at 852, brokering illegal rental bookings, *HomeAway*, 918 F.3d at 683, or designing a product that poses an unreasonable risk of harm to users, *Lemmon*, 995 F.3d at 1092. Compliance with the duty underlying such a claim does not come at the cost of the speech interests behind Section 230. Companies have a compliance option outside the speech-stultifying choices in the moderator's dilemma. *Internet Brands*, 824 F.3d at 851–52 (explaining that providing protection for a failure-to-warn claim would not serve the "core policy" of Section 230 because the duty underlying the claim would not force the defendant into the moderator's dilemma); *HomeAway*, 918 F.3d at 684 (explaining that Section 230 protection could be denied because complying with the ordinance would not force rental platforms into the moderator's dilemma); *Lemmon*, 995 F.3d at 1092 (underlying duty would not require altering user speech, only taking "reasonable measures to design a product more useful than it was foreseeably

dangerous."); *Twitter*, 148 F.4th at 645 (changing the design of a content reporting tool by, e.g., "allowing people to report child pornography sent via private messaging" was sufficient compliance); *id.* at 648 (reporting known CSAM was all duty required."). Imposing a duty on an online platform that does not require the exercise of editorial control simply cannot force that platform to censor users or to give up its content moderation activities.

#### 2. A duty does not result in the moderator's dilemma unless it springs from publishing conduct.

The source criterion recognizes that online platforms sometimes act as publishers, but sometimes they do not. Section 230 only applies when a duty is imposed specifically because a business acted as a publisher. *See Barnes*, 570 F.3d at 1102. Ninth Circuit precedent has definitively established that the source criterion is a necessary condition for Section 230 protection.

As the Ninth Circuit has explained, an entity acts as a publisher when it "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Barnes*, 570 F.3d at 1102; *see also HomeAway*, 918 F.3d at 681; *Twitter*,

148 F.4th at 640. Publishing cannot just be a but-for cause of a claim, as "publishing content is a but-for cause of just about everything" an online platform does. *Twitter,* 148 F.4th at 647 (quoting *Lemmon*, 995 F.3d at 1093); *also Internet Brands*, 824 F.3d at 853. A duty must proximately derive from the defendant's publishing of the content or its moderation activities. *See Barnes,* 570 F.3d at 1108 (refusing to bar a promissory estoppel claim requiring defendant to remove user-generated content because the duty proximately derived from a promise, even though the duty would not have arisen if the defendant had not published the content).

The moderator's dilemma helps to explain why. If intermediaries generally faced a duty to remove user-generated content whenever they undertook to moderate their platforms, as in *Prodigy*; removed offending content, *Barnes*, 570 F.3d at 1103; or offered a reporting mechanism, *Twitter*, 148 F.4th at 645, they may stop engaging in those activities. Such claims would thus "discourage the core policy of section 230(c), 'Good Samaritan' filtering of third-party content." *Internet Brands*, 824 F.3d at 852. By contrast, a duty to remove content that does not automatically spring from the mere publication of user-

generated content or a moderation activity derives instead from an intermediary's non-publishing conduct and thus can be avoided by not undertaking that conduct. *Barnes*, 570 F.3d at 1108; *Calise*, 103 F.4th at 742–43 (explaining why contract claims are not barred under Section 230).

*Barnes* definitively established that the source criterion is a necessary condition for Section 230 protection. The *Barnes* Court analyzed two claims against Yahoo: a negligent undertaking claim and a promissory estoppel claim. *Barnes*, 570 F.3d at 1099. Both claims met the required action criterion because both alleged Yahoo had a duty to remove fake profiles that a woman reported for harassment. *Id.* at 1103, 1107. But the *source* of this duty differed for each claim. The Court constructed the negligent undertaking claim as deriving from an activity that any publisher who moderates third-party content would undertake: the removal of offensive material. *Id.* at 1103. This claim would fault an intermediary for undertaking a moderation action and not following through, treating them as the publishers of the material they left up. As the *Barnes* Court pointed out, this claim would essentially impose the same duty as a defamation claim under a

distributor liability theory and was thus barred by Section 230. *Id.* By contrast, the source of the promissory estoppel claim was not Yahoo's moderation actions but "Yahoo's manifest intention to be legally obligated to do something," i.e., its promise to remove the fake profiles. *Id.* at 1107. Allowing this claim would not force Yahoo into the moderator's dilemma because it had a choice to avoid liability outside the choices in the dilemma: "to avoid liability: it need only disclaim any intention to be bound." *Id.* at 1108.

In sum, both the required action and source criteria are necessary for a claim to qualify for Section 230 immunity. This Court has treated each criterion as a necessary condition in past cases. And it is only when both criteria are met that a claim imposes a duty analogous to the publisher duties that spurred Congress to enact Section 230.

#### 3. ***Doe v. Twitter*** **does not establish that either criterion is sufficient on its own for Section 230 protection.**

In arguing that either criterion is sufficient for Section 230 protection, Defendants rely on inelegantly phrased dicta in *Twitter*, 148 F.4th at 642. In describing Ninth Circuit precedent, the *Twitter* Court suggested that, if the asserted duty "springs 'from the defendant's

status as a publisher,' *or* if the means to avoid liability requires the defendant to act as a publisher, immunity applies. Otherwise, immunity is off the table." *Id.* at 642 (quoting *Calise*, 103 F.4th at 742) (emphasis added). But this is not how the *Twitter* Court actually applied Section 230 to the plaintiffs' claims. As explained in Section I.B.2., the Court found that Section 230 did not apply to two of the plaintiffs' five claims *solely because* the required action criterion was not met. *Id.* at 645, 648. For the three remaining claims, the Court found that the required action criterion was met but did not explicitly analyze the source criterion. Nevertheless, all three claims do, in fact, satisfy the source criterion.

The first claim the *Twitter* Court barred was a claim for knowingly benefiting from a sex trafficking venture by profiting from advertisements published alongside known CSAM. *Id.* at 642. The Court found that the claim met the required action criterion because it "impose[d] a monitoring obligation" and required the defendant "to remove third-party posts." *Id.* at 643. While the Court did not identify the source of the duty, it seems clear that this criterion is also satisfied. The defendant's knowledge of the CSAM derived from its content

reporting tool. *Id.* at 641. Providing a content reporting tool is a moderation activity because it is how a platform receives information about potentially harmful content that the company then uses to decide whether to remove (i.e., moderate) that content. Requiring a company to act whenever they get a report of unlawful content forces the company to choose between perfectly removing unlawful reported content and abandoning the reporting tool. This is precisely the kind of distributor liability the *Barnes* Court found implicates Section 230. *Barnes*, 570 F.3d at 1103. Indeed, platforms removing their reporting tools in response to an unforgiving notice-and-takedown requirement would not be good for the online speech environment.

The second claim alleged that Twitter's failure to remove reported CSAM pending review was a product defect. *Twitter*, 148 F.4th at 645. The Court recognized that the duty underlying this claim required Twitter to remove reported CSAM automatically and thus met the required action criterion. *Id.* Again, the Court did not identify the source of the duty, but, like the beneficiary of sex trafficking claim, the source was Twitter's provision of a content reporting tool, which is part of its content moderation system. Thus, like the beneficiary-of-sex-

trafficking claim, this claim met both the required action and source criteria and would have imposed the type of distributor liability that implicates the core interests underlying Section 230.

The last claim the *Twitter* Court barred alleged that Twitter's search functions and hashtag tools were defective because users could use them to label material as CSAM. *Id.* at 646. The plaintiffs claimed that Twitter had a duty to block CSAM-related hashtags, which would have required Twitter "to monitor and act when its users adapt them to illicit ends." *Id.* at 647. In other words, the duty would have required Twitter to exercise editorial control over the user-generated hashtags and thus met the required action criterion. Twitter's duty also allegedly derived in part from the fact that they blocked other hashtags. *Id.* at 646. Essentially, the source of the duty was the fact that Twitter exercised editorial control over *other* user-generated hashtags, so it could exercise editorial control over the hashtags plaintiffs complained of. The duty underlying this claim was analogous to the publisher's duty *Prodigy* imposed on platforms and would thus result in the moderator's dilemma: Twitter would have been forced to either proactively remove

all harmful hashtags, stop blocking other hashtags, or stop publishing third-party hashtags altogether.

Thus, *Twitter* in fact affirms that both criteria are necessary to recreate the publishing duties Congress sought to prevent by enacting Section 230.

## II. Plaintiffs' claims do not force Defendants into the moderator's dilemma.

In this case, Section 230 does not apply. Holding companies liable for processing payments for illegal online casinos does not implicate the moderator's dilemma. First, even to the extent that Defendants might opt to monitor some content to determine the lawfulness of in-app transactions before processing payment for them, there is no requirement for Defendants to remove the apps or any content about them from their stores. Second, the duty imposed by the Plaintiffs' claims stems from Defendants' role as a payment processor for in-app transactions, and processing these payments is not synonymous with publishing third-party content. For these reasons, the claims in this case do not seek to treat the defendants as publishers and fall firmly outside Section 230's immunity.

### A. The claims in this case do not require app stores to exercise editorial control over third-party content.

As already explained, a claim that treats a company as a publisher for Section 230 purposes must impose a duty that would "necessarily require" the company to monitor and exercise editorial control over third-party content. *HomeAway*, 918 F.3d at 682. Holding companies liable for processing payments for illegal casinos does not impose such a duty.

Though Defendants argue that the duty imposed by the claims in this case will force them to monitor third-party content—specifically, the applications they process payments for—this monitoring is completely separate from any exercise of editorial discretion. The claims do not require Defendants remove social casinos from their app stores. They only assert that companies have a duty not to process payment for illegal *transactions*.

Imposing such a duty will not force Defendants into the moderator's dilemma. Companies could comply with this duty without removing any apps from their stores. The claims do not even hinge on processing payments to download illegal casino apps. The only thing alleged to be wrongful is processing transactions exchanging real money

for chips and profiting from those activities. To the extent the companies feel obliged to monitor third-party content, it is not to inform how they exercise any editorial control, but rather to inform the entirely non-publishing activity of brokering online gambling payments. This is not the type of content "monitoring" that the required-action prong of the Ninth Circuit test refers to.

### B. The source of the Defendants' alleged duties is their processing of payments, not any publishing conduct or status.

The source of the Defendants' alleged duties is their processing and profiting from chip transactions in gambling games, not from their status or conduct as publishers. While Defendants do engage in both activities, the claims in this suit only allege they violated duties springing from their payment processing activities for illegal conduct. That means the claims do not "treat" them "as publishers" under Section 230. An entity that books, processes, or profits from wagering transactions may have a duty to do so in accordance with various gambling laws, whether they are a casino, a tech company, or a bookstore. It is the Defendants' processing of and profiting from

transactions that is alleged to give rise to their duties, not their mere display of gambling applications within their app stores.

The Defendants' alleged duties spring from their processing of payments for gambling transactions within apps, not from their reviewing, editing, and publishing of third-party information. While processing a payment for published material—like a book or a podcast—might be synonymous with the publishing of that material, processing payments for chips within an illegal casino game is synonymous with the conduct undertaken by the cash window in a casino. The latter conduct does not "magically become lawful" simply because it moves online. *Roommates.com*, 521 F.3d at 1164. Nor does it matter that publishing activity is a but-for cause of the gambling transactions. *Internet Brands*, 824 F.3d at 853; *HomeAway*, 918 F.3d at 682. This Court has recognized that booking a rental transaction is not publishing activity even when the transaction relates to third-party content the publisher disseminated. *See HomeAway*, 918 F.3d at 682–83.

Much like in *HomeAway*, Defendants' alleged duties here sprung from processing transactions, not publishing activities. To discharge

those duties, Defendants have options other than exercising editorial control over what app developers post to their app stores. Allowing the claims to proceed would not disincentivize the publishing or moderation activities Defendants are engaged in. Processing in-app payments is simply not necessary for publishing or distributing apps. And requiring Defendants to monitor non-public transaction data does not threaten user speech. Section 230 is inapplicable to the Plaintiffs' claims.

## III. Denying Section 230 protections here will not break the internet.

Refusing to apply Section 230 here will not destroy the internet or online app marketplaces. It will not force companies to stop hosting apps, processing payments to purchase them, or even brokering in-app payments. It simply ensures that app stores do not get special immunity to profit from illegal transactions that other payment processors would be held liable for.

Denying Section 230 protection does not create any new liability. It only stops tech companies from being artificially immunized from existing liability. There may be instances where it would be unfair or inappropriate to hold a payment processor liable for an unlawful transaction: the underlying substantive law can protect processors in

these cases. Indeed, regular payment processors have long operated without Section 230 protections and have had no issue staying profitable. In this very case, the district court dismissed state law claims that failed on the merits. There is no reason to overextend Section 230 beyond its text and purpose just to allow internet companies to broker unlawful transactions that other processors could be punished for.

Defendants argue that it is nonetheless necessary to apply Section 230 to avoid creating an "easy end-run" around Section 230. Meta's Opening Br. 27. They warn that applying the statute correctly would allow plaintiffs to "repackage any content-based claims" as challenges to the processing or facilitating of transactions. *Id.* This is plainly not the case. The parade of horribles the Defendants present, such as the threat that a platform may be held liable for processing a subscription to a podcast or newsletter that contains defamatory material, *see* Google's Opening Br. 57, raises a completely different Section 230 issue than that raised by this case. It is akin to saying that a police officer not being granted qualified immunity for an off-duty murder would sound the death knell of police work.

Unlike Defendants' hypotheticals, this case does not involve companies processing payments for illegal *content* (which may have a stronger claim to Section 230 protection), but rather companies processing illegal *transactions*. The real-world analog is not a bookseller selling defamatory books, but a bookseller who installs and profits from an illegal slot machine in their store. With this correct understanding of the legal issue, it is hard to envision *any* situation other than illegal casino payments where internet companies might be exposed to liability as a result of affirming the district court's decision.

The lack of negative repercussions following this Court's previous decisions not to grant Section 230 immunity proves that narrow interpretations of Section 230 do not stifle online speech or destroy online businesses. When this Court recognized that online home rental companies must comply with local regulations against brokering rentals for unregistered properties, *HomeAway*, 918 F.3d at 683, it did not cause online rental platforms to fold. When this Court said that app developers still have a duty to design safe products, *see Lemmon*, 995 F.3d at 1092–93, platforms did not adopt draconian measures to crack down on user-generated content. When this Court found that websites

still have a duty to warn users about known dangers to their safety, *see Internet Brands*, 824 F.3d at 853, it did not destroy web forums. And when this Court held that social media companies have a duty to abide by content moderation promises they make to users, *see Barnes*, 570 F.3d at 1109, it did not destroy social media.

There is no reason why denying app stores Section 230 protection for the illegal transactions they broker should restrict the availability of apps, or even of in-app payment processing by app stores. Internet companies have plenty of viable options to prevent facilitating illegal gambling transactions that do not involve "restructur[ing] their business models." Google's Opening Br. 56. Indeed, real-world payment processors have had procedures in place to prevent brokering illegal gambling transactions for well over a decade. *See* Letter from Kenneth E. Swab, Senior Fed. Gov't Rels. Officer, to Jennifer J. Johnson, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., (Dec. 12, 2007).[3] This has not forced these processors to severely curtail their payment processing

---

[3] https://www.federalreserve.gov/SECRS/2007/December/20071217/R-1298/R-1298_148_1.pdf.

activities, nor stopped them from processing tens of billions of dollars of payments each year.

What is more, despite the Defendants' complaints of needing to review apps to identify which operate as illegal casinos, major app stores already routinely review apps prior to publication. Apple, for instance, notes on its app-developer guidelines that "every app is reviewed by experts and an editorial team." *App Review Guidelines*, Apple (last updated June 8, 2026).[4] The Defendants could easily use such review processes to identify illegal casino apps, and then either refuse to process in-app payments for such apps or subject such payments to increased scrutiny to verify their legality.

Denying Section 230 protection in this case consequently will not destroy the internet or have a destabilizing effect on the online app marketplace. By contrast, *providing* Section 230 protection here would have a clear harmful effect, giving an unprecedented and sweeping immunity for internet companies to profit from aiding and abetting criminal activity. In the process, it would allow shady unlicensed gambling operations to rely on the reputation of security offered by

[4] https://developer.apple.com/app-store/review/guidelines/.

some of the world's largest internet companies to legitimize their illegal activities. And it would incentivize internet companies to willingly play this role through the promise of big financial rewards with zero risk of liability. This sweeping immunity is a far cry from what Congress sought to achieve in enacting Section 230 and would put platforms' profits ahead of the interests and wellbeing of consumers.

## CONCLUSION

For the foregoing reasons, EPIC respectfully urges the Court to affirm the district court's denial of the motions to dismiss with respect to Section 230.

**Date**: July 17, 2026

/s/ *Megan Iorio*
Megan Iorio
Tom McBrien
Hayden Davis
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140

*Attorneys for Amicus Curiae*
*Electronic Privacy Information Center*

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

**This brief contains 6,850 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select one only)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-1(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length permitted by Cir. R. 32-2(b) because *(select one only)*:

> [ ] it is a joint brief submitted by separately represented parties;
>
> [ ] a party or parties are filing a single brief in response to a longer joint brief.
>
> [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: /s/ Megan Iorio **Date**: July 17, 2026

## CERTIFICATE OF SERVICE

I certify that on July 17, 2026, this brief was e-filed through the ACMS System of the U.S. Court of Appeals for the Ninth Circuit. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

**Date**: July 17, 2026

/s/ Megan Iorio
Megan Iorio
Tom McBrien
Hayden Davis
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140

*Attorneys for Amicus Curiae*
*Electronic Privacy Information Center*