**Nos. 25-7916, 25-7917**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION

KATHLEEN WILKINSON, ET AL.,

*Plaintiffs-Appellees,*

*v.*

META PLATFORMS, INC., ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of California
(Nos. 5:21-md-03001, 5:21-cv-02777, 5:21-md-02985)
The Honorable Edward J. Davila

# REPLY BRIEF OF DEFENDANTS-APPELLANTS GOOGLE LLC AND GOOGLE PAYMENT CORP.


Teresa Michaud
COOLEY LLP
335 South Grand Avenue, Suite 900
Los Angeles, CA 90071
(213) 561-3250

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Elizabeth B. Prelogar
Ephraim A. McDowell
Alexander J. Kasner
Elias S. Kim
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
(202) 839-7800
eprelogar@cooley.com

(*additional counsel listed on inside cover*)

*Counsel for Defendants-Appellants Google LLC and Google Payment Corp.*

Lauren Gallo White
WILSON SONSINI GOODRICH
& ROSATI, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000

Brian M. Willen
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Sixth Ave, 40th Floor
New York, NY 10019
(212) 999-5800

*Counsel for Defendants-Appellants Google LLC and Google Payment Corp.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................2

I. Section 230 Bars Plaintiffs' Claims Because They Require Google To Monitor Third-Party Content ........................................4

A. Under This Court's Precedents, Section 230 Bars Claims That Impose a Duty to Monitor Third-Party Content ................5

B. Google Can Avoid Liability Under Plaintiffs' Claims Only by Monitoring Social-Casino Content ..............................9

II. Section 230 Also Bars Plaintiffs' Claims Because Distributing Content In Exchange For Money Is A Publishing Function ..............15

A. Distributing Content For Pay Is Publishing Activity, and That Is What Google Does ...................................................16

1. Plaintiffs' brief confirms that Google engages in publishing activity by distributing content for pay. ......16

2. Virtual casino chips are third-party "information" or "content" under Section 230. ...................................19

3. This Court's precedent refutes Plaintiffs' position........22

B. Plaintiffs Cannot Escape This Court's Neutral-Tools Precedents .......................................................................25

III. Denying Section 230 Protection Would Threaten Sweeping Liability For Online Publishers .......................................................28

CONCLUSION ............................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .................................................. 18, 29-30

*Estate of Bride ex rel. Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .................................................. 6-7, 15

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .................................................. 20, 23

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .................................................. 2-3, 8-9, 13, 15-17, 21

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .................................................. 24-25

*Coffee v. Google, LLC*,
No. 20-cv-3901, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022) .................................................. 26

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .................................................. 6-7, 13

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) .................................................. 3, 5-9, 11, 13, 19, 21, 27

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .................................................. 21

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .................................................. 6, 23

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .................................................. 18, 25-27

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) .................................................. 10, 24

*Green v. Am. Online (AOL)*,
318 F.3d 465 (3d Cir. 2003) .................................................. 19

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hamad v. Gates*,
732 F.3d 990 (9th Cir. 2013) ....................................................................7

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ....................................................11, 14, 23

*Kater v. Churchill Downs Inc.*,
886 F.3d 784 (9th Cir. 2018) ....................................................................12

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
341 F.3d 987 (9th Cir. 2003) ....................................................................24

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ....................................................................6

*Mason v. Machine Zone, Inc.*,
851 F.3d 315 (4th Cir. 2017) ....................................................................12

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ...........................................................17, 24

**Statutes**

47 U.S.C.
§ 230(b)(2) .....................................................................................28
§ 230(c)(1) ........................................................1-2, 14, 16, 19, 21-23, 27
§ 230(e)(3) .....................................................................................1, 14
§ 230(f)(3) ..........................................................................19, 21, 23, 27

**Other Authorities**

Merriam-Webster Online
*Content*, https://perma.cc/GUS9-QQAE ................................................20
*Information*, https://perma.cc/QJ65-DEEE ............................................19

Substack, *How Much Does Substack Cost?* (Dec. 16, 2025)
https://perma.cc/ZR87-5JPJ .....................................................................28

# INTRODUCTION

Publishers have long distributed third-party content in exchange for money. Bookstores purchase books at a wholesale price, sell and distribute them to customers at a higher retail price, and keep the difference as a profit. Newsstands do the same with newspapers and magazines. And Google now plays an analogous role in the digital environment: it hosts app content, collects payments from app users who want that content, distributes that content to users' phones or tablets, and remits a portion of the payments to app developers.

Section 230 protects Google from claims premised on those publishing activities. By its terms, Section 230 provides that "no liability may be imposed" for a claim that "treat[s]" a platform as a "publisher" of third-party content. 47 U.S.C. § 230(c)(1), (e)(3). And this Court's precedent makes clear that online platforms cannot be forced to monitor third-party content to avoid liability. Because Plaintiffs' claims seek to hold Google liable for processing payments for particular types of virtual third-party content that it distributes—and impose an obligation to monitor that content—the claims are barred by Section 230.

Plaintiffs do not dispute that distributing content for pay is publishing activity. And they only briefly defend what they call the "nuclear option" proposed by the district court, Response Brief (RB) 55: ceasing payment services for all apps and forgoing "millions if not billions in revenue." 1-GoogleER-15. Instead, Plaintiffs

suggest that virtual casino chips in an app-based game are not content at all and assert that Google's challenged conduct is thus no different than processing payments for real-estate rentals, croissants, or real-life chips in an actual casino. That position is misconceived. Virtual casino chips are an embedded element of app-based games—akin to a game player's avatar. The Supreme Court has held that video games receive First Amendment protection. It follows that a visual feature within an app-based game—whose sole function is to enable further gameplay—is "information" or "content" under Section 230. 47 U.S.C. § 230(c)(1).

On that proper understanding, Section 230's application is clear. To avoid liability under Plaintiffs' claims, Google would need to monitor the content provided by millions of apps—and the millions of transactions within those apps—to identify and refuse to process transactions that involve sales of virtual chips for virtual slot machines. And beyond that, Plaintiffs' claims strike at the heart of Google's quintessential publishing function: distributing virtual content to users in exchange for pay. This Court should reverse.

## **ARGUMENT**

Plaintiffs concede (at 20) that the framework set forth in *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), governs this case and that Google has two independent paths to Section 230 immunity. Under *Calise*, the Court must "look to the legal 'duty'" underlying plaintiffs' claims and "examine two things":

(1) whether the duty "derives from the defendant's status or conduct as a 'publisher'"; and (2) whether the duty "obliges the defendant to 'monitor third-party content'—or else face liability." *Id.* at 740, 742 (citation omitted); *see Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 642 (9th Cir. 2025). If the answer to either question is yes, then Section 230 "immunity applies." *Twitter*, 148 F.4th at 642 (quoting *Calise*, 103 F.4th at 742).

Plaintiffs seek (at 16) to frame the relevant duty as refraining from "act[ing] as the broker for illegal gambling transactions." But in prior cases, this Court has not reflexively accepted the plaintiffs' framing of the relevant duty. In *Twitter*, for instance, the plaintiffs argued that their claim imposed on Twitter a "duty not to 'knowingly benefit' from participation in a sex-trafficking venture." 148 F.4th at 643. Instead of accepting that description, this Court examined the allegations and determined that the plaintiffs sought to impose on Twitter a duty "to avoid the unlawful benefit from hosting child pornography" by "remov[ing] third-party posts—a quintessential publishing activity." *Id.*

Following that approach here, the alleged duty underlying each of Plaintiffs' claims is the same: according to Plaintiffs, Google must not provide payment-processing services for purchases of certain third-party content—*i.e.*, virtual chips in social-casino apps. *See* 2-GoogleER-135. That is a publishing-related duty barred by Section 230 for two independent reasons. First, Google would need to monitor

which apps provide allegedly unlawful social-casino content—and which content sales within those apps allegedly qualify as unlawful gambling—to avoid liability. Second, Plaintiffs' claims arise from Google's distribution of virtual content in exchange for money—a quintessential publishing activity.[1]

## I. SECTION 230 BARS PLAINTIFFS' CLAIMS BECAUSE THEY REQUIRE GOOGLE TO MONITOR THIRD-PARTY CONTENT

Where, as here, a plaintiff's claims would require the defendant to monitor third-party content to avoid liability, Section 230 applies. Opening Brief (OB) 23-30. Plaintiffs only briefly defend the district court's conclusion that Google has no monitoring duty because it could "choose to stop offering [its] own payment processing" to *all* app developers "and allow app developers to use the services of dedicated third-party processors." 1-GoogleER-14. Instead, Plaintiffs distort this Court's precedents to focus on removing and editing content rather than monitoring content. And they fundamentally misunderstand what Google would need to do to avoid liability here.

[1] Plaintiffs suggest (at 22) there is "little point in resolving this interlocutory appeal" because "many of the claims have been dismissed with leave to replead." But Plaintiffs omit that, after this Court granted interlocutory review, the district court stayed the case and explained that "since the Section 230 issue has the potential to terminate the actions in their entirety, the Ninth Circuit's consideration of the appeal stays any filing of an amended complaint." Order Staying Case Pending Interlocutory Appeal 5, *In re: Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-03001 (N.D. Cal. June 1, 2026), Dkt. 174.

### A. Under This Court's Precedents, Section 230 Bars Claims That Impose a Duty To Monitor Third-Party Content

This Court has repeatedly held that when a claim "obliges the defendant to 'monitor third-party content' to avoid liability," it "treats the defendant as a publisher" and is barred by Section 230. *Twitter*, 148 F.4th at 640 (citation omitted). Here, Plaintiffs seek to hold Google liable for processing payments for certain content (virtual chips) used for certain purposes (alleged gambling) within certain apps (social casinos). OB26-27. The only way for Google to avoid liability under Plaintiffs' theory would be to monitor the content provided by the millions of apps in its store—and then monitor the millions of transactions within those apps—to determine which transactions involve the sale of virtual casino chips. Thus, under Plaintiffs' theory, Google "would be required to monitor" use of its payment-processing tool and "act when its users adapt [the tool] to illicit ends." *Twitter*, 148 F.4th at 647. Section 230 forecloses that theory.

Plaintiffs assert (at 40) that "[t]he term 'monitoring' in the context of Section 230 refers only to reviewing third-party content as part of an editorial function." And by "editorial function," *id.*, Plaintiffs appear to mean only "remov[ing], modify[ing], or otherwise chang[ing]" content, *id.* at 48. But this Court's precedents refute that understanding of monitoring. Instead, they make clear that Section 230 bars any claim that would require a defendant to "monitor and review third-party

content" to avoid liability. *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1167 (9th Cir. 2026).

Unsurprisingly, this Court has regularly referred to "monitoring," "removing," and "editing" as distinct functions, each of which constitutes a publishing activity. In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), for instance, the Court held that Section 230 did not apply because the defendant's "alleged duty in th[e] case . . . 'ha[d] nothing to do with' its editing, monitoring, *or* removing of the content that its users generate." *Id.* at 1092 (emphasis added) (citation omitted). The Court has also stated that the term "'publisher'" refers not only to "someone who 'reviews material . . ., perhaps edits it . . ., and then decides whether to publish it," but *also* to someone who must "'monitor third-party content.'" *Twitter*, 148 F.4th at 640 (citation omitted). And the Court has explained that Section 230 does not apply where the plaintiff's claim "would not require [the defendant] to remove any user content *or* otherwise affect how it publishes or monitors such content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (emphasis added).

Plaintiffs rely heavily (at 41) on *Estate of Bride ex rel. Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168 (9th Cir. 2024), which used the term "moderate" instead of "monitor" when summarizing the *Calise* framework. *See id.* at 1177 ("If [a claim] requires that [the defendant] moderate content to fulfill its duty, then § 230

immunity attaches." (emphasis omitted)). But *Bride*'s isolated use of the term "moderate" carries little weight. "Unlike statutes, judicial opinions 'are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis.'" *Hamad v. Gates*, 732 F.3d 990, 1000 (9th Cir. 2013) (citation omitted). And in cases post-dating *Bride*, this Court has reiterated that Section 230 applies to any claim that "obliges the defendant to '*monitor* third-party content' to avoid liability." *Twitter*, 148 F.4th at 640 (emphasis added) (citation omitted). In fact, the Court recently emphasized that "[a]sking a platform to monitor and review third-party content goes to Section 230's core." *Doe 1*, 174 F.4th at 1167. Thus, this Court should not read *Bride*'s offhand use of "moderate" to fundamentally alter the Section 230 framework that the Court has applied in countless other cases.

In any event, *Bride* clarified that "moderating content" refers to the "deletion, change, *or suppression*" of content. 112 F.4th at 1180 (emphasis added). So not even *Bride* supports Plaintiffs' "remove, modify, or otherwise change" formulation. RB48. And here, Plaintiffs seek to hold Google liable for failing to monitor and then *suppress* virtual-chip content—or the virtual casino apps in which such chips are generated—through the denial of payment-processing services. Accordingly, *Bride* confirms Section 230's applicability in this case.

This Court's decision in *Twitter* reinforces that a claim can impose a

monitoring duty without imposing a duty to remove or modify content. There, the plaintiffs alleged that Twitter had "designed an unreasonably dangerous product" by including "hashtag and search functions" that allowed users to find child pornography more easily. 148 F.4th at 646. The plaintiffs took "no issue with the general interaction between the hashtag and search functions when put to lawful ends." *Id.* But they alleged that Twitter had a duty to "prevent[] its search feature from responding to hashtags used solely to identify child pornography." *Id.* This Court held that Section 230 barred the plaintiffs' claims because they would "require[]" Twitter "to monitor" all uses "of its hashtag and search functions," "[d]istinguish[] between innocent" and "nefarious ones," and then prevent users from "adapt[ing] [the functions] to illicit ends." *Id.* at 646-47. The Court reached that conclusion even though the plaintiffs did not seek to require Twitter "to remove, modify, or otherwise change" the underlying content. RB48; *see Calise*, 103 F.4th at 744 (holding that Section 230 barred plaintiffs' unjust-enrichment claim because "to avoid liability," Meta "would need to actively vet and evaluate third party ads").

The same logic applies here. Like the plaintiffs in *Twitter*, Plaintiffs here take "no issue with" Google's general offering of payment-processing tools for "lawful ends." 148 F.4th at 646. But they allege that Google has a duty to "prevent[]" those tools from being used to facilitate allegedly unlawful sales of virtual chips. *Id.* Thus, their claims would "require[]" Google "to monitor" all uses of its payment-

processing tools, "[d]istinguish[] between innocent" and "nefarious ones," and then prevent use of those tools for "illicit ends." *Id.* at 646-47. As in *Twitter*, Section 230 bars such claims.

### B. Google Can Avoid Liability Under Plaintiffs' Claims Only By Monitoring Social-Casino Content

As explained, the "alleged legal duty" underlying Plaintiffs' claims, *Twitter*, 148 F.4th at 642, is the obligation to refrain from processing payments for certain kinds of virtual content in social-casino apps. According to Plaintiffs, Google can fulfill that duty by denying payment-processing services to social-casino apps, "remov[ing] social casinos from [its] offerings," or "geo-restricting games such that they can only be played in certain states." 3-GoogleER-229 (¶¶ 95-96). Because Google would need to monitor third-party content to take any of those actions, Section 230 bars Plaintiffs' claims. OB26-30.

Google's position is not—as Plaintiffs suggest—that Section 230 applies simply because Plaintiffs' claims could "'affect[]' how [Google] 'monitors'" its platform, RB43 (citation omitted), or "lead [Google] to . . . *consider* third-party content," RB45. Section 230 applies because Plaintiffs' claims would *require* Google to "actively vet and evaluate" the content involved in millions of transactions across millions of apps. *Calise*, 103 F.4th at 744; *see* OB27-30. Every time Google received a request to process the sale of content in an app, it would need to assess whether that content resembles a virtual casino chip, whether that chip will be used

to play a virtual casino game in the app, and whether that game has features that make it illegal under applicable state law. OB28-30. If the answer to those questions is yes, Google would have to disallow use of the payment function for that transaction. Absent that detailed monitoring, Google "would have no way to distinguish unlawful [transactions] from perfectly legitimate" ones. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc).

Plaintiffs assert (at 47-48) that their claims "do not imply any duty to review, vet, or monitor" social-casino apps because "a duty only arises when the Platform is faced with the decision about whether it will agree to broker a *subsequent* transaction for chip packages that are used as part of a slot machine game." And according to Plaintiffs, Google can decline to process such a transaction without monitoring content because "requests [for payment-processing services] are 'distinct, internal, and nonpublic.'" *Id.* at 48 (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)).

But whether a transaction request is "internal" and "nonpublic" does not change the fact that Google would have to monitor published content to decide whether it can approve the transaction. As already explained, Google would need to determine (1) whether the relevant app provides social-casino content; (2) whether the in-app content being sold is a virtual chip; (3) whether that chip will be used to

play a virtual-casino game; and (4) whether that game violates applicable state law. In short, Google would "be required to monitor" third-party content and then prevent users from employing the payment function for "illicit ends." *Twitter*, 148 F.4th at 647.

Because Plaintiffs' claims would require Google to monitor sales of virtual content, *HomeAway* is inapposite. There, the defendants processed "transactions for . . . properties," not transactions for content. *HomeAway*, 918 F.3d at 682. And those defendants did not need to "review the content provided by the hosts of listings on their websites" to determine whether they could process a transaction for a particular property—they simply needed to "cross-reference bookings against Santa Monica's property registry." *Id.* Here, by contrast, a transaction request alone would tell Google almost nothing about whether it could permissibly process that transaction. Instead, as the district court itself recognized, "[t]he only way [Google] can determine if [it] may or may not process a payment transaction is to cross-reference that transaction against the app it originated in" and the content within that app. 1-GoogleER-14.

Plaintiffs further err in arguing (at 49) that Google "need only monitor . . . requests . . . from social casino app developers." As an initial matter, unlike in *HomeAway*, there is no official registry of social-casino apps—and the apps available on Google Play change constantly. Compiling a list of social-casino apps

would itself require Google to "review the content provided" by all apps on Google Play. *HomeAway*, 918 F.3d at 682. And determining which of those apps qualify as "social casinos" would not be straightforward—Plaintiffs themselves have failed to settle on a consistent list of such apps. *Compare* 2-GoogleER-54-57 (listing 50 social-casino apps in the amended master complaint), *with* Statewide Class Action Compl. 4-8, *Brown v. Google, LLC*, No. 8:20-cv-01311 (N.D.N.Y. Oct. 22, 2020), Dkt. 1 (listing the "200 most downloaded" social-casino apps in underlying class-action complaint).

More fundamentally, even if Google could compile such a list, it would need to constantly monitor the content *within* the social-casino apps. For instance, social-casino apps sell not only virtual casino chips, but also *other* content to which state gambling laws would not plausibly apply (and that Plaintiffs do not claim is unlawful). OB28. Many apps offer social-casino content as only a small part of a larger game experience. Many also offer various games, only some of which (*e.g.*, slot machines) constitute allegedly unlawful gambling under Plaintiffs' theory. 2-GoogleER-50 (referencing "the Illegal Slots"). And some purchases of virtual casino chips may not violate state gambling laws—*e.g.*, if the chips do not "extend the privilege of playing" the relevant social-casino game. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018); *see Mason v. Machine Zone, Inc.*, 851 F.3d 315, 319 (4th Cir. 2017) (concluding that certain virtual chip transactions did not

violate Maryland law because of "the manner in which the Game of War casino operates"). Accordingly, to continue providing payment-processing services while avoiding liability under Plaintiffs' theory, Google would need to carefully parse the content of every casino-related app, monitor essentially every virtual-content transaction within that vast and ever-changing array of apps, and distinguish between permissible and impermissible ones. Their "theor[y] of harm" thus "depend[s] on the content of third-party" apps. *Doe 1*, 174 F.4th at 1168.

Plaintiffs also contend (at 49) that their claims do not impose a duty to monitor content because even if Google declines to process transactions for a social-casino app, that "app remains available in the app store, entirely unchanged." To the extent Plaintiffs suggest that Google can have a monitoring obligation only if it must remove or restrict the distribution of apps themselves, that suggestion flouts this Court's precedent. This Court has repeatedly applied Section 230 to bar claims that would impose a duty to monitor posts, messages, or other content *within* an app. *See, e.g.*, *Twitter*, 148 F.4th at 641 (photographs); *Calise*, 103 F.4th at 736 (advertisements). If Plaintiffs are instead suggesting that Google can have a monitoring obligation only if it must remove certain content, that suggestion is wrong for the reasons above. *See supra* at 5-9.

Plaintiffs' invocation (at 51) of "interstate federalism" is equally unavailing. Contrary to Plaintiffs' suggestion (at 52), Google does not object to simply

"monitor[ing] and understand[ing] local regulations." States can obviously "charge [platforms] with keeping abreast of the law without running afoul of" Section 230. *HomeAway*, 918 F.3d at 683. That is not the issue here. Instead, Google cannot avoid liability under Plaintiffs' state-law claims without monitoring the content of every app on Google Play.

Nor does Google dispute the benefits of "our federalist system generally." RB52. But Congress has expressly barred state-law claims that seek to "treat[]" online platforms "as the publisher" of third-party content or that otherwise impose liability "inconsistent" with Section 230. 47 U.S.C. § 230(c)(1), (e)(3). And under the Supremacy Clause, that federal enactment is controlling. At the same time, nothing in Section 230 would bar Plaintiffs from asserting state-law claims against the social-casino app developers themselves. Plaintiffs have instead taken a different tack and sued the intermediary platforms for hosting, disseminating, and providing publishing-related services to those apps. Congress designed Section 230 to preclude such a gambit.

Plaintiffs halfheartedly fall back on the district court's reasoning—which Plaintiffs concede "is the nuclear option." RB55. Like the district court, Plaintiffs suggest that "[t]he Platforms could simply 'stop offering their own payment processing and allow app developers to use the services of dedicated third-party processors.'" *Id.* (quoting 1-GoogleER-14). But Plaintiffs identify no case in which

a court has denied Section 230 protection because a company could eliminate a critical platform-wide service—thus fundamentally restructuring its business—to avoid monitoring content. And Plaintiffs do not even address—much less distinguish—the cases in which this Court has rejected such reasoning. OB32.

In *Calise*, for instance, this Court never asked whether Meta could avoid content monitoring by ceasing its sales of third-party ads altogether. 103 F.4th at 744. Instead, the Court held that Section 230 applied because, within the advertising platform Meta offered, avoiding a claim for unjust enrichment would have required Meta to "actively vet and evaluate third party ads." *Id.* And the Court emphasized that it would not interpret Section 230 to require Meta to disavow "a fundamental part of [its] business model and that of countless other internet companies . . . just because it could be misused by third parties." *Id.* at 745.

Plaintiffs emphasize (at 42) *Bride*'s passing statement that, "[f]or immunity to attach" based on a content-monitoring duty, monitoring "must be the [platform's] only option." 112 F.4th at 1177 n.3. But the Court there clarified that "nothing" in its decision "extend[ed] legal exposure" beyond what "already existed under . . . *Calise*." *Id.* at 1182. And *Calise* illustrates why Section 230 applies here.

## II. SECTION 230 ALSO BARS PLAINTIFFS' CLAIMS BECAUSE DISTRIBUTING CONTENT IN EXCHANGE FOR MONEY IS A PUBLISHING FUNCTION

As Google's opening brief explains (at 38-41), distributing content for pay is

a traditional publishing function. Plaintiffs seek to hold Google liable for distributing virtual content to users' devices in exchange for money. Thus, Plaintiffs' claims "spring[] from" Google's "status or conduct as a 'publisher.'" *Calise*, 103 F.4th at 740 (citation omitted).

Plaintiffs have no answer to that straightforward logic. They cannot repackage content distribution as "brokering illegal gambling transactions" through mere say-so. Nor can they seriously claim that virtual chips—an integral part of social-casino games—are not content at all. And this Court's neutral-tools precedents independently foreclose their position in all events.

### A. Distributing Content For Pay Is Publishing Activity, and That Is What Google Does

Section 230 bars Plaintiffs' claims because they seek to "treat[]" Google "as the publisher" of "information" or "content" provided by a third party. 47 U.S.C. § 230(c)(1). Plaintiffs do not contest that distributing content for pay is a traditional publishing activity. And their complaint challenges precisely that activity. Plaintiffs' brief cannot transform virtual chips into something other than third-party content.

#### 1. Plaintiffs' brief confirms that Google engages in publishing activity by distributing content for pay.

Settled common-law precedent establishes that distributing content in exchange for money is a publishing function—indeed, it is the very business of

publishing. OB38-41. That is why the common law treated newsstands and booksellers as publishers. In turn, Congress enacted Section 230 against that common-law backdrop, thereby "incorporat[ing]" the "well-settled" understanding that "publishers" include those who distribute content for pay. *Calise*, 103 F.4th at 738 (citation omitted); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1108, 1118-19 (9th Cir. 2007) (holding that Section 230 barred claims against entity that processed payments for content).

Plaintiffs do not acknowledge, much less contest, the common-law authority establishing that distribution of content for pay is a publishing function. In fact, they appear to concede (at 50) that when "bookstores . . . charge money for books," they act as "publishers." Nor do Plaintiffs dispute that Section 230 incorporates the common-law meaning of "publishing."

Thus, the key question is whether Google's conduct here falls within that common-law meaning. It does: Google distributes app content to users' phones or tablets in exchange for payment and remits those payments to app developers after deducting a fee. OB41. That is materially indistinguishable from the conduct of bookstores: they purchase printed content at a wholesale price, distribute that content to customers in exchange for payment, and keep the difference between the wholesale and list price.

Plaintiffs' own complaint and brief confirm the point. Their complaint alleges

that: (1) "Google collects the money players spend on virtual chips," (2) "takes a cut for itself," and (3) "remits the rest to the [app developers]." 2-GoogleER-51 (¶ 61). And their brief states (at 6) that Google "process[es] every transaction" "for virtual chips," "collect[s] real money from consumers, keep[s] a 30% cut, and remit[s] the rest to the developers." That is quintessential publishing activity.

Elsewhere, Plaintiffs' brief insists that Google does not distribute virtual content for pay but rather "broker[s] illegal gambling transaction[s]," RB26, and "act[s] as the cashier's cage" for social casinos, RB1. But that is just colorful rhetoric. When Plaintiffs' brief actually explains what "brokering illegal gambling transactions" entails, that explanation matches the complaint's allegations: providing access to virtual content for pay.

Plaintiffs thus err in framing the question as whether brokering "gambling" transactions is "a traditional publishing activity." RB16; *e.g.*, *id.* at 30. In *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019), for instance, this Court did not ask whether "facilitat[ing] illegal drug sales" is a traditional publishing activity. *Id.* at 1095. Instead, it asked whether the defendant website's "recommendation[] and notification[]" functions—which ultimately "facilitate[d]" the drug sale at issue—were publishing activities. *Id.* at 1098. Here, then, the proper inquiry is whether Google's distribution of virtual content for pay involves publishing activity. Plaintiffs cannot "escape section 230(c) by labeling" as

gambling "an action that is quintessentially that of a publisher." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102-03 (9th Cir. 2009).

**2. Virtual casino chips are third-party "information" or "content" under Section 230.**

Plaintiffs next argue (at 31) that even if distributing content for pay is publishing activity, the virtual "chips or tokens used for gambling in the social casino game[s]" are not content covered by Section 230. That argument lacks merit.

By its terms, Section 230 protects publishers "of *any information* provided" "through the Internet or any other interactive computer service." 47 U.S.C. § 230(c)(1), (f)(3) (emphasis added). "Information" simply means "a signal or character . . . representing data." *Information*, Merriam-Webster Online, https://perma.cc/QJ65-DEEE; *see Green v. America Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003). Virtual casino chips plainly qualify as "information provided through the Internet" because they are signals or characters representing data used to play online social-casino games. Thus, Google cannot be held liable for distributing those virtual chips to app users' phones and tablets for pay.

Section 230 also refers to an "information *content* provider," 47 U.S.C. § 230(c)(1) (emphasis added), and this Court's precedents use "content" as a synonym for "information." In *Twitter*, for instance, the Court explained that if a platform "is disseminating content created by others, it is functioning as a publisher and is immune from liability relating to that content." 148 F.4th at 640. "Content"

refers to the "written matter, images, music, etc. . . . offered by a website or on social media." *Content*, Merriam-Webster Online, https://perma.cc/GUS9-QQAE. Virtual chips are content because they include designs and images tailored to particular social-casino games—such as the gold coins in DoubleDown Casino. OB42. Indeed, Plaintiffs ultimately acknowledge (at 33) that virtual chips are a "kind of content."

More fundamentally, virtual chips are part and parcel of social-casino games themselves. Plaintiffs do not dispute that social-casino games are content—and indeed expressive content. Nor could they: the Supreme Court has held that "video games qualify for First Amendment protection" because they "communicate ideas . . . through features distinctive to the medium." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011). And because social-casino games are content, the virtual chips must be as well—after all, they are features of the game whose sole function is to enable users to continue playing. The virtual chips "cannot be used outside of any individual [social-casino] app," 2-GoogleER-51 (¶ 63), and cannot be "cash[ed] out," 2-GoogleER-43 (¶ 3). They are therefore no different from other content available for purchase within app-based games hosted by Google—from the Monopoly money sold in the Monopoly Go app to the extra Poké Balls sold in the Pokémon Go app.

Plaintiffs nonetheless claim (at 50) that Google's processing of payments for

virtual chips is akin to a bookstore's processing of payments for "croissants" at its "café." But unlike croissants, virtual chips qualify as "information" and "content" "provided through the Internet" under Section 230. 47 U.S.C. § 230(c)(1), (f)(3). And while a bookstore's sale of croissants is independent of its sale of books, Google's distribution of in-app content (including for pay) is integral to its hosting and distribution of the apps themselves. That is why Section 230 protects Google's conduct here but not the conduct of "dedicated payment processors such as PayPal, Square, and Stripe" when they facilitate ordinary commercial transactions for food or clothing. 1-GoogleER-13; *see* OB53.

Plaintiffs also suggest (at 31) that Section 230 could only protect the processing of payments for "something that resembles . . . a book or a magazine." But while publishing historically involved printed matter like books and magazines, Congress enacted Section 230 to protect the distribution of new forms of internet-based content. Recognizing as much, this Court has consistently applied Section 230 to protect the distribution of online content that looks nothing like a book or magazine—ranging from virtual ads, to Tweets, to dating-app "matches." *See Calise*, 103 F.4th at 744; *Twitter*, 148 F.4th at 643; *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152 (9th Cir. 2025). No principled basis exists for distinguishing the social-casino apps and virtual chips here from those other forms of online content.

Plaintiffs further insist that Google's performance of some publishing functions does not "confer broad immunity on all of [its] online conduct." RB26 (capitalization omitted). Plaintiffs attack a strawman. Google does not contend that Section 230 bars claims premised on its payment processing because it engages in *other* publishing activities, such as hosting third-party apps. Rather, Google contends that distributing virtual content for pay is *itself* a publishing function. Thus, Google acts as a publisher both when it hosts apps and when it distributes virtual content available within those apps for pay.

Contrary to Plaintiffs' assertion (at 32), Google is not "recasting gambling as something else to skirt state law." If social-casino apps are providing access to gambling in violation of state law, Plaintiffs can seek to hold the developers of those apps liable. But the mere allegation that Google's conduct in facilitating the purchase of virtual chips within those apps amounts to participation in illegal gambling cannot avoid Section 230's protections. Where, as here, claims about illegal gambling would in fact hold Google liable for distributing third-party "information" and "content" in exchange for money, they run headlong into Section 230. 47 U.S.C. § 230(c)(1).

### 3. This Court's precedent refutes Plaintiffs' position.

Plaintiffs also cannot reconcile their position with this Court's precedent. To start, their reliance on *HomeAway* is again misplaced. They maintain (at 29) that

"the duty imposed on the hosting platforms [in *HomeAway*] was the duty not to broker a financial transaction for an unlicensed vacation rental." But that description illustrates why *HomeAway* is inapposite. Real-world rental properties are not "information" or "content" under Section 230, much less information or content "provided through the Internet." 47 U.S.C. § 230(c)(1), (f)(3). And as this Court explained, "completing booking transactions for unlawful rentals . . . consists only of nonspeech, nonexpressive conduct." *HomeAway*, 918 F.3d at 685. Here, by contrast, virtual chips are "information" or "content" under Section 230's plain terms—and those chips are also embedded within social-casino games that "qualify for First Amendment protection." *Brown*, 564 U.S. at 790.

Plaintiffs correctly note (at 29) that in *HomeAway*, the asserted duty "did not spring from" the hosting platforms' "publication activities, such as allowing third parties to put up the rental listings on their sites." But that is precisely Google's point: Here, the asserted duty *does* spring from Google's publishing activities—namely, its distribution of virtual content within a gaming app in exchange for pay. Thus, *HomeAway* only reinforces Section 230's application in this case.

Plaintiffs next accuse Google of relying on a "'but-for' test" that this Court's precedents have disavowed. RB33 (quoting *HomeAway*, 918 F.3d at 682). That misunderstands Google's argument. Google does not claim that Section 230 applies because Google's "hosting" of apps "could be described as a 'but-for' cause of

[plaintiffs'] injuries." *Internet Brands*, 824 F.3d at 853. Instead, Section 230 applies because Google's distribution of virtual chips for pay is publishing activity, and Plaintiffs' claims seek to hold Google liable for that activity.

Unlike *HomeAway* and *Internet Brands*, this Court's decision in *Perfect 10* is squarely on point. As Plaintiffs admit (at 35), the Court there "appl[ied] Section 230 immunity to a defendant who processed payments." *See* OB45. Plaintiffs claim that "*Perfect 10* is no longer good law" because it relied on "the but-for test the Court subsequently rejected." RB35-36. Not so: *Perfect 10* does not refer to or rely on any but-for test, and this Court has never overruled, repudiated, or limited that decision. *Perfect 10* is "therefore binding on subsequent three-judge panels of this circuit." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 995 (9th Cir. 2003).

Plaintiffs observe (at 35) that *Perfect 10* cited *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), which this Court later "clarif[ied]" does not hold that "an information content provider [is] *automatically* immune so long as the content originated with another information content provider," *Roommates.com*, 521 F.3d at 1171 at n.31. But *Perfect 10* cited *Carafano* only once (merely as a "see also"), and never suggested that it obviated the need to determine whether the "defendant had acted as the publisher of third-party content." RB35. To the contrary, the cited passage from *Carafano* states that "[t]hrough [Section 230],

Congress granted most Internet services immunity from liability for *publishing* false or defamatory material so long as the information was provided by another party." 339 F.3d at 1122 (emphasis added). *Perfect 10* is good law, and a straightforward application of that decision would suffice to decide this case.

### B. Plaintiffs Cannot Escape This Court's Neutral-Tools Precedents

This Court's neutral-tools precedents likewise establish that Google's payment processing is a publishing activity. The Court has consistently held that a platform "act[s] as a publisher of others' content" by offering "tools meant to facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098. Payment processing is precisely such a tool: it facilitates the seamless paid exchange of virtual content. OB47.

As amici explain, integrated payment processing saves developers who sell virtual content from "having to build a separate payment solution into each and every app." Br. of CCIA 28. That capability especially benefits small developers, many of which would lack the resources to "build and run their own payment processing functionality or pay for a third party service." Br. of ACT 4. The tool also benefits purchasers of virtual content, allowing them "to engage in a seamless and frictionless payment flow, increasing convenience," "guard[ing] against fraud," and "mak[ing] payments more secure." Br. of NetChoice & Chamber of Progress 10-11. Thus,

Google's payment-processing tool facilitates the exchange of in-app content for money.

Plaintiffs respond (at 36) that this Court's neutral-tools precedents do not "relate[] to the question of whether the right Plaintiffs assert springs from [Google's] status as a publisher." That is wrong. *Dyroff* specifically held that the defendant website operator "was acting as a *publisher* of others' content" because the functions it provided—"recommendations and notifications"—were "tools meant to facilitate the communication and content of others." 934 F.3d at 1098 (emphasis added). Plaintiffs acknowledge this portion of *Dyroff*, *see* RB37, but overlook its direct applicability here.

Instead, Plaintiffs fixate on *Dyroff*'s analysis of whether the "tools [at issue] are neutral," RB37; *see* 934 F.3d at 1099, which is "relevant to the third prong" of the Section 230 inquiry, RB36—*i.e.*, whether the content is provided by the platform or a third party. But while the neutrality of a content-distribution tool relates to the third prong, the platform's offering of the neutral tool in the first place relates to whether that platform is "acting as a publisher of others' content." *Dyroff*, 934 F.3d at 1098.

Plaintiffs also maintain (at 38) that Google's payment-processing tool does not perform "content delivery functions" at all. As noted above, however, that tool enables apps to seamlessly deliver content to users in exchange for money. *See*

*Coffee v. Google, LLC*, No. 20-cv-3901, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022) (holding that Section 230 protects Google's "provision of neutral tools and services" for processing in-app "sales of virtual currency" that can be used to purchase virtual items). Contrary to Plaintiffs' suggestion (at 38), it is immaterial whether Google could pay "someone else" to operate its payment-processing tool. The same could have been said in *Dyroff*: there, the defendant website operator could have hired a third party to manage its "recommendation[] and notification[]" functions. 934 F.3d at 1098. Yet the Court still held that the defendant's offering of those tools was publishing activity.[2]

Finally, Plaintiffs' *HomeAway* hypothetical misses the mark. *See* RB38. A platform that processes rentals for unlicensed properties could not evade liability by issuing tokens that could be "redeem[ed] . . . for nights at unlicensed properties." *Id.* Real-estate properties are not "information" or "content" "provided through the Internet" under Section 230, 47 U.S.C. § 230(c)(1), (f)(3), and simply "adding in the extra step of buying the token" would not alter that reality, RB38. Conversely, the virtual chips here are embedded within and enable further gameplay in social-casino

[2] To the extent Plaintiffs suggest (at 38) that only "recommendation algorithms" can qualify as neutral tools, that is manifestly wrong. In *Dyroff* itself, the Court held that both recommendations *and* "email notifications" constituted neutral content-distribution tools, 934 F.3d at 1098, and this Court has subsequently applied that analysis to various other publishing features, *e.g.*, *Twitter*, 148 F.4th at 646 ("hashtag and search functions").

games that are themselves online "information" and "content." Claims that seek to hold Google liable for processing sales of virtual content that unlocks access to further virtual content—and taking a portion of the sale—are premised on publishing activity.

## III. DENYING SECTION 230 PROTECTION WOULD THREATEN SWEEPING LIABILITY FOR ONLINE PUBLISHERS

As already shown, statutory text and precedent refute Plaintiffs' interpretation of Section 230. But if there were any doubt, Congress's objectives specified in Section 230(b) point in the same direction. Among other things, Section 230(b) makes clear that "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet." 47 U.S.C. § 230(b)(2). Plaintiffs' position would allow state laws to disrupt that market by eviscerating the widespread and beneficial practice of in-app payment processing.

The effects of Plaintiffs' interpretation could extend well beyond social casinos. A holding that processing payments for third-party virtual content is not a publishing activity could prompt a wave of new lawsuits against platforms. Indeed, claims that have long been deemed barred by Section 230 could be recast as challenges to payment-processing activities simply because the publisher earned money from the distribution of third-party content.

For example, Substack is a platform that offers paid subscriptions to electronic newsletters on topics ranging from politics, to law, to financial literacy. Similar to

Google, Substack's business model relies on taking a commission on each subscription fee. Substack, *How Much Does Substack Cost?* (Dec. 16, 2025) https://perma.cc/ZR87-5JPJ. Following Plaintiffs' playbook, enterprising litigants could sue Substack for supposed defamation contained in any of the millions of paid newsletters it distributes each day—even though Congress enacted Section 230 "in part to respond to a New York state court decision which held that an internet service provider could be liable for defamation." *Barnes*, 570 F.3d at 1101 (citation omitted). The threat of crushing damages liability could potentially force Substack to restrict its offerings or shut down altogether, closing off a thriving forum for free expression on the Internet. The consequences would be even more dire for emerging "startups and smaller platforms, which are particularly vulnerable to increased liability exposure." Br. of CCIA 31.

The first time this case was on appeal, Plaintiffs sought to blunt the harsh consequences of their position by explicitly conceding that "[o]ffering a subscription or selling a newsletter is quintessentially publishing conduct." Appellees' Br. 30, *In re: Google Play Store Simulated Casino-Style Games Litigation*, No. 22-16888 (9th Cir. Oct. 25, 2023), Dkt. 38. Perhaps realizing that their concession undermined their argument, Plaintiffs' brief here is more equivocal. But to the extent Plaintiffs have backed away from their earlier concession, they would need to accept that their theory sweeps far beyond social casinos and imperils the paid distribution of

newsletters, podcasts, ebooks, videos, music, and more. In turn, by chilling platforms' payment processing, Plaintiffs' position would ultimately "silenc[e] independent authors, video producers, and small businesses who rely on" built-in payment-processing services to remain afloat "and reach their audiences." Br. of SIIA 15.

Plaintiffs assert (at 8-9) that they have suffered harms from using social-casino apps. But as discussed above, Plaintiffs can seek compensation for those alleged harms through suits against social-casino app developers. Indeed, Plaintiffs' counsel have already sought and obtained remedies or settlements against those developers. *See, e.g.*, Judgment, *Larsen v. PTT, LLC*, No. 3:18-cv-05275 (W.D. Wash. June 11, 2025), Dkt. 629. Thus, properly applying Section 230 would not leave Plaintiffs without recourse for their alleged harms. By contrast, rejecting Section 230's application here would chill "the free exchange of information and ideas over the Internet" that Congress sought to protect. *Barnes*, 570 F.3d at 1099 (citation omitted).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order denying in part Google's motion to dismiss and remand with instructions for the court to dismiss Plaintiffs' amended master complaint with prejudice.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*

Elizabeth B. Prelogar
Ephraim A. McDowell
Alexander J. Kasner
Elias S. Kim
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
(202) 839-7800
eprelogar@cooley.com

Teresa Michaud
COOLEY LLP
335 South Grand Avenue, Suite 900
Los Angeles, CA 90071
(213) 561-3250

Connie L. Wang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Brian M. Willen
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Sixth Ave, 40th Floor
New York, NY 10019
(212) 999-5800

Lauren Gallo White
WILSON SONSINI GOODRICH
& ROSATI, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000

*Counsel for Defendants-Appellants*
*Google LLC and Google Payment Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7916, 25-7917

I am the attorney or self-represented party.

**This brief contains 6,959 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Elizabeth B. Prelogar* **Date** August 31, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*