Nos. 25-7916, 25-7917

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION

KATHLEEN WILKINSON, ET AL.,

*Plaintiffs-Appellees*,

v.

META PLATFORMS, INC., ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Case Nos. 5:21-cv-02777, 5:21-md-03001 | Hon. Edward J. Davila

# REPLY BRIEF OF META PLATFORMS, INC.

Kristin A. Linsley
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
(415) 393-8200

Jacob T. Spencer
Giuliana C. Cipollone
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500

Theodore J. Boutrous, Jr.
Christopher Chorba
Timothy Loose
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendant-Appellant Meta Platforms, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. Plaintiffs' Claims Would Impose Liability for Meta's Publication Activities Based on the Type of Third-Party Content Being Purchased .......... 6

A. A Duty Not to Make Particular Third-Party Content Available for a Fee Springs from an Online Service's Status as Publisher of the Content .......... 7

B. Section 230 Has No Exception for Alleged "Gambling" Content .......... 19

II. Plaintiffs' Claims Also Treat Meta as a Publisher by Requiring Monitoring of Third-Party Content .......... 25

A. Plaintiffs Do Not Dispute That Forcing a Provider to Stop All In-App Purchases Is Not a Legitimate Alternative to Monitoring .......... 25

B. Plaintiffs' Theory That Section 230 Forbids Only Duties to "Moderate" Third-Party Content Conflicts with This Court's Decisions and Supports Reversal in Any Event .......... 27

CONCLUSION .......... 34

CERTIFICATE OF COMPLIANCE .......... 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AT&T Corp. v. Coeur d'Alene Tribe*,
295 F.3d 899 (9th Cir. 2002) .......... 23

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......... 28

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 14, 22

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) .......... 20

*Estate of Bride by & through Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .......... 14-17, 26, 28, 30, 31

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .......... 20, 21, 29

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... 4, 26, 27, 32

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......... 12

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .......... 4, 14-16, 18, 22, 27, 29

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) .......... 4-6, 14, 20, 25, 26, 30

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .......... 17, 23, 27, 30

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......... 15, 17

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .................................................. 10, 14, 23

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ............................ 6, 12, 13, 15, 20, 23, 26

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ................................. 1, 8-11, 16, 17, 32-34

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016) ................................................................. 12

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ............................................................................ 13

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ............................................................ 16

*Marvin v. Trout*,
199 U.S. 212 (1905) ............................................................................ 23

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .............................................................. 12

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ............................................................................ 23

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ............................................... 6, 11, 12

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ............................................................................ 24

*Smith v. California*,
361 U.S. 147 (1959) ...................................................................... 13, 28

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................................. 22

*There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*,
19 F.3d 1165 (7th Cir. 1994) .......... 21

*Zango, Inc. v. Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009) .......... 13

**Constitutional Provisions**

U.S. Const. Amend. I .......... 28, 29

**Statutes**

47 U.S.C. § 230(b)(2) .......... 18

47 U.S.C. § 230(c)(1) .......... 2, 9, 11, 20, 21, 31

47 U.S.C. § 230(e)(1) .......... 2, 22

47 U.S.C. § 230(e)(2) .......... 2, 22

47 U.S.C. § 230(e)(3) .......... 24

47 U.S.C. § 230(e)(4) .......... 2, 22

47 U.S.C. § 230(e)(5) .......... 2, 22

47 U.S.C. § 230(f)(3) .......... 2, 9, 11, 21

**Other Authorities**

Curry, *Candy Crush Revenue and Usage Statistics*,
Business of Apps (Jan. 7, 2026) .......... 24

Curry, *Consumer Spending on Apps Surpassed Games for the First Time in 2025*, Business of Apps (Feb. 5, 2026) .......... 24

H.R. Rep. No. 104-458 (1996) .......... 32

## INTRODUCTION

Section 230 protects online services that facilitate access to third-party content for a fee. Plaintiffs and their amici hardly dispute that principle as applied to online services that accept money in exchange for electronic books or podcasts, keep a portion for themselves, and then remit the balance to the content creators. Yet they insist that this case is different because the particular third-party content here—virtual, online-only chips that players use in online video games that simulate casinos—was allegedly used in online "gambling transactions." But Section 230 contains no exception for claims about purported "gambling" content. Under the statutory text and this Court's precedent, Plaintiffs' claims treat Meta as a publisher of the virtual chips by seeking to hold it liable for facilitating access to that third-party content for a fee.

Plaintiffs cast *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), as the source of a sweeping exception from Section 230 for any and all claims that would impose liability for a "transaction," even if the "transaction" involves payment for third-party content. But *HomeAway* was a narrow ruling—one that, as this Court took pains to emphasize in *HomeAway* itself and in later decisions, addressed a

municipal zoning ordinance that did not proscribe any third-party content and prohibited only transactions for real-world rental properties. This case is fundamentally different: Plaintiffs concede (at 11, 40) that their claims would proscribe and prohibit payments for access to third-party content—virtual chips used in casino-themed online video games. Because such claims depend on the nature of the content that players buy on Facebook and would hold Meta liable for making the third-party content available to them, the claims would impose liability for publication of third-party content in violation of Section 230.

That conclusion is not affected by Plaintiffs' allegation (at 8) that they used the purchased third-party content to "gamble" in video-game casinos where the "winnings" constitute extended gameplay online, not money or anything else of real-world value. Section 230 prohibits treating online services as the publisher of "any information" provided "through the Internet" by a third party. 47 U.S.C. § 230(c)(1), (f)(3). Here, both the virtual chips and the video-game casinos are indisputably third-party content under that definition. And "gambling content" is not among the enumerated exceptions to that prohibition. *See id.* § 230(e)(1)-(2), (4)-(5). Plaintiffs cannot evade Section 230 by claiming that the

challenged third-party content (virtual chips) can be used to engage with third-party content (simulated casino games) that they contend involves "gambling."

To be clear, Meta disputes Plaintiffs' attempt to characterize animated slot machines as actual "gambling." But whoever is right on that point, what matters under Section 230 is that Meta's challenged conduct is limited to hosting video games and facilitating payments for whatever embedded content the app developers may offer—no different from online games that allow users to buy chips that can be used to solve more puzzles or coins to build "fantasy" sports teams. Meta hosts all of those apps in the same way. That is why Plaintiffs do not, and cannot, dispute that their claims necessarily turn on the *content* of social casino apps.

Plaintiffs' claims also would require Meta to monitor third-party content—a quintessential publishing duty that Section 230 bars, as this Court has repeatedly held. Plaintiffs barely try to defend the district court's conclusion that the obvious monitoring problem presented by Plaintiffs' claims can be ignored so long as Meta can choose to discontinue all in-app purchases for all third-party content. Instead, they argue (at 40) that Section 230 prohibits only duties to *moderate*, which they

apparently define as a duty to monitor *and* remove offending content. But that monitoring-plus rule does not help them. The alleged duty not to facilitate the sale of particular content—books, movies, or (as here) virtual items within a video game—is content moderation in its plainest form. And in any event, this Court has repeatedly held that Section 230 bars claims that would require online services to monitor third-party content, even if the claim would not require them to take it down.

In short, Section 230 protections do not vanish just because online content is made available for payment. The district court erred in holding otherwise, so this Court should reverse.

## ARGUMENT

Under Section 230, a claim treats a defendant as a publisher of third-party content when the liability theory "necessarily relies on information provided by third parties." *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1168 (9th Cir. 2026). Plaintiffs concede that, under *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), Section 230 bars claims that *either* hold an online service liable for publishing third-party content *or* impose publisher duties such as monitoring third-party content. *See* 1-ER-9. As this Court explained in *Doe 1 v. Twitter, Inc.*, 148

F.4th 635 (9th Cir. 2025), Section 230 applies if the alleged right "springs 'from the defendant's status as a publisher,' or if the means to avoid liability requires the defendant to act as a publisher." *Id.* at 642. The statutory text compels that understanding: Section 230 not only protects online services when they publish third-party content, but also prevents them from being forced to engage in publisher functions. Meta Br. 35.

Plaintiffs concede (at 22-25) that Section 230 applies the same way to all of their claims, each of which turns on Meta's alleged duty not to "collect[] the money players spend on virtual chips, take[] a cut for itself, and remit[] the rest" to the third-party developers. 2-ER-176 (¶ 61); *see* Meta Br. 65. That duty reduces to not providing third-party content (virtual chips) in exchange for payment. Because accepting payment for content is publishing activity, and because Meta could comply with Plaintiffs' proposed "gambling-content-only" duty solely by monitoring third-party content, Section 230 bars all of their claims.*

* Plaintiffs' suggestion (at 22) that "there is little point in resolving this interlocutory appeal" because the district court asked them "whether they intend to file an amended complaint," 1-ER-38, mixes apples and oranges. The court's point was just that Plaintiffs might try to fix certain deficiencies on the *merits*. 1-ER-38. But it recognized from the start that, if this Court agrees with Meta's view of Section 230, "the case is resolved

## I. Plaintiffs' Claims Would Impose Liability for Meta's Publication Activities Based on the Type of Third-Party Content Being Purchased.

Section 230 bars Plaintiffs' theory, at the heart of all of their claims, that Meta acted unlawfully by making certain third-party content (virtual chips) available for in-game purchase within a specific subset of video games, which they concede are also third-party content. When Meta displays games on Facebook, it "is disseminating content created by others" and "is functioning as a publisher" of that content. *Twitter*, 148 F.4th at 640. Meta also engages in the "quintessential publishing activity" of facilitating in-app purchases of online content—the exchange of content for money, with Meta keeping a portion and remitting the balance to the content developers. *Id.* at 643; *see* 2-ER-176 (¶ 61); Meta Br. 37. This Court has never held Section 230 inapplicable just because a person pays to access the challenged content. *E.g., Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162, 1173-74 (9th Cir. 2008) (en banc) (payment of "monthly fee" to access comment section); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1108,

---

in its entirety." 1-ER-74. Any effort by Plaintiffs to cure the defects in their claims that are *unrelated* to Section 230 would be beside the point.

1118-19 (9th Cir. 2007) (payment of "membership fee" for "access to content on the website").

Plaintiffs launch two attacks on this conclusion: (1) that the processing of payments for third-party content does not treat defendants as publishers, and (2) that Section 230 does not apply to "gambling transactions." *E.g.*, Plaintiffs Br. 21. Both arguments are wrong: A duty not to make third-party content available for a fee would impose liability for publishing the content, and nothing in Section 230 allows a different result just because a plaintiff alleges that the content can be used later to engage with more online content that they contend constitutes "gambling."

### A. A Duty Not to Make Particular Third-Party Content Available for a Fee Springs from an Online Service's Status as Publisher of the Content.

Plaintiffs' first argument is an effort to evade the key question in this case: whether a defendant loses protection under Section 230 for displaying content if the user must pay to receive it. They start with a maximalist reading of this Court's decision in *HomeAway*, even though the Court there said nothing to suggest that Section 230 does not reach paid content. And they have no explanation for cases like *Roommates.com*

and *Perfect 10*, where this Court applied Section 230 to bar claims against online services that charged for access to third-party content. Because accepting money for content is what publishers have always done, claims that impose liability for purchased third-party content treat the defendant as the publisher of such content.

1. Plaintiffs construe *HomeAway* to create a categorical rule that Section 230 never applies to claims that target allegedly unlawful transactions, even those involving third-party content. But *HomeAway* said nothing of the kind. Nor did it even have occasion to address the question, because the case did not involve transactions for content.

*HomeAway* involved a Santa Monica zoning ordinance that prohibited short-term rentals of unregistered properties and also barred online platforms from processing payments for such prohibited rentals. Two online rental platforms (Airbnb and HomeAway) argued that Section 230 preempted the latter prohibition because any prohibited rental transactions would be preceded by listings on their platforms, and because not being allowed to process payments for the underlying rentals would leave them no practical choice but to remove those listings. 918 F.3d at 682-83. But that peripheral role was not enough, this Court explained,

because the ordinance imposed liability only for "unlicensed bookings" of the underlying rental properties, not for the existence or content of any online listing. *Id.* at 684. In fact, the law did not "proscribe, mandate, or even discuss" the content of any third-party listings on the platforms. *Id.* at 683.

*HomeAway* stands for the unremarkable point that legal prohibitions on payments for real-world goods or services do not treat online providers as publishers within the meaning of Section 230, even if there might be a third-party listing that advertises the real-world good or service. A duty not to sell stale croissants, for example, would not treat a bookstore like a publisher any more than it would treat a bakery like a publisher. Plaintiffs Br. 50. That outcome makes sense: Offline goods, services, and real-property rentals are not third-party content constituting "information provided by another information content provider" and are certainly not "information provided through the Internet." 47 U.S.C. § 230(c)(1), (f)(3). So the ordinance in *HomeAway* did not implicate Section 230 because it did not regulate third-party content in any way, much less require online services to change the way that they published such content. 918 F.3d at 683-84.

The analysis in *HomeAway* also undermines Plaintiffs' position. Meta Br. 48-49. The duty at the core of their claims here—an alleged duty not to accept payment for virtual chips to be used in online third-party video games—would necessarily "proscribe" the "content" of those online games. *HomeAway*, 918 F.3d at 683. Plaintiffs reaffirm (at 11) their core theory that transactions for virtual chips are unlawful because "substantially all of the chips . . . are for the purpose of gambling" in virtual video games. Under this view, Meta would face liability *precisely* because the third-party content it published for a fee was virtual chips used to extend time playing animated slots in imaginary online casinos, rather than (for example) virtual hearts to extend the time playing Candy Crush or gems to extend the time playing Scrabble GO. Unlike the plaintiffs in *HomeAway*, Meta would "face liability for the content" it publishes, bringing this case squarely within Section 230. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (citing *HomeAway*, 918 F.3d at 683).

Plaintiffs try (at 30) to retreat from *HomeAway*'s rationale but still attempt to prop up the district court's view that Section 230 does not protect online services when they accept payments for third-party content.

*See* 1-ER-12. Whatever else one might say about that view, *HomeAway* certainly does not support it. The online listing services in *HomeAway* did not take money in exchange for access to third-party content—the sole basis for any alleged liability here. 2-ER-176 (¶ 61). They took money in exchange for rentals of "unregistered properties." 918 F.3d at 682. And rental properties, again, are not "information" provided "through the Internet" by "another information content provider." 47 U.S.C. § 230(c)(1), (f)(3). *HomeAway* simply did not address, and certainly did not decide, whether Section 230 bars a law that forbids the sale of particular online information.

2. This Court's precedents that *do* address that question have held that Section 230 protects online services when they provide access to third-party content in exchange for payment. The plaintiffs in *Perfect 10* sued an online payment-processing service that "allow[ed] consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues" containing images pirated by third parties. 488 F.3d at 1108. This Court held that, under Section 230, the plaintiffs could not hold the payment-processing service liable "for information originating with a third-party user"—that is, the allegedly pirated

images. *Id.* at 1118-19; *see* Meta Br. 40. And in *Roommates.com*, this Court applied Section 230 to bar claims that would have held the website liable for third-party content that it made available only to "paying subscribers." 521 F.3d at 1162, 1173; *accord Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20-21 (1st Cir. 2016) ("acceptance of anonymous payments" for online advertisements).

Plaintiffs' concession (at 35) that *Perfect 10* "did apply Section 230 immunity to a defendant who processed payments" resolves this appeal. They nonetheless argue (at 35-36) that this Court somehow abrogated this aspect of *Perfect 10* in *Roommates.com*. But they make no effort to show that *Roommates.com* is "clearly irreconcilable" with *Perfect 10*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Nor could they, given that *Roommates.com* itself applied Section 230 to a service that charged for access to content. Nothing in *Roommates.com* overruled *Perfect 10* on this point.

Instead, Plaintiffs offer (at 35) a bank-shot theory. *Roommates.com*, they say, overruled *Perfect 10* because *Perfect 10* cited *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), and *Roommates.com* in turn "clarif[ied] the reasoning" of certain "unduly broad" language in

*Carafano*. *Roommates.com*, 521 F.3d at 1171. But that clarification went to an entirely separate issue: whether Section 230 automatically applied in all instances where information originated with a third party, even if the website operator "contribute[d] to the content's illegality" and would constitute a "developer" of that content under Section 230. *Id.* at 1171 & n.31. *Roommates.com* did not issue a blanket overruling of every prior case that cited *Carafano*. On the contrary, this Court has continued to cite *Perfect 10* after *Roommates.com*, including for the rule that Section 230 can bar "business torts." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 (9th Cir. 2009). *Perfect 10* remains good law and is dispositive of this appeal.

3. *Perfect 10* also correctly captures the ordinary understanding of how publishers make third-party content available. From time immemorial, publication has "take[n] place under commercial auspices." *Smith v. California*, 361 U.S. 147, 150 (1959). Sellers of "books, newspapers, and magazines" allow customers access to the speech of others "for profit"—and would not go to the trouble of publishing without payment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). That is why a

publisher is, at bottom, "'one whose *business* is publication.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added).

For these reasons, exchanging third-party content for money, including remitting part of the payment to the creator, is "quintessentially the province of a publisher." *Twitter*, 148 F.4th at 645; *see* Meta Br. 39; SIIA Br. 5; NetChoice Br. 10. Content-payment functions are part of the process of making third-party content available, not a nonpublishing activity that happens to occur alongside publication.

If parties could isolate the processing of payments for content from the publication of the content itself, then they could always "plead around Section 230's strictures"—just as Plaintiffs initially tried to do here by challenging *both* the hosting of social casino games *and* the processing of in-app purchases of virtual chips as part of that hosting function. *Doe 1*, 174 F.4th at 1167 (brackets omitted) (quoting *Estate of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024)); *see* 1-ER-70. But such creative pleading efforts cannot evade Section 230 because the content-payment feature is a publishing function that is "meant to facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098; *see* Meta Br. 38. By seeking to penalize Meta's use of

a payment function to facilitate access to third-party content, Plaintiffs' claims treat Meta as the publisher of the content being purchased.

4. Plaintiffs also attempt (at 33-36) to equate a prohibition on holding online services responsible for purchased third-party content with the "but-for" test this Court has rejected. But Meta is not invoking "a general immunity against all claims derived from third-party content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). Instead, this Court's decisions distinguish between claims where liability arises from third-party content and claims where liability relates to but is independent of such content. It is Plaintiffs, not Meta, who would blur this settled distinction.

As this Court explained en banc in *Roommates.com*, Section 230 protects online services "against liability arising from content created by third parties." 521 F.3d at 1162. This Court recently reaffirmed that claims treat defendants as publishers when the liability theory "'attempt[s] to hold a defendant responsible for users' speech or the decision to publish it'" or (put another way) "necessarily relies on information provided by third parties." *Doe 1*, 174 F.4th at 1167-68 (brackets omitted) (quoting *Estate of Bride*, 112 F.4th at 1180). Under that test, a claim

seeking to hold a defendant liable for allowing access to a particular type of third-party content in exchange for money, 2-ER-176 (¶ 61), "depends on the content of third-party [games]"—*i.e.*, the purchased content and its in-game uses. *Doe 1*, 174 F.4th at 1168. Such claims "[a]t root" are about third-party content, not about the way that the defendant processed payments. *Estate of Bride*, 112 F.4th at 1180; *see* Meta Br. 46. And the "harm" that Plaintiffs allege arises directly from online third-party content—namely, the online casino-themed video games they claim to have played. *Estate of Bride*, 112 F.4th at 1180.

The "but-for" rule describes a handful of cases where third-party content might play a peripheral role in the challenged events, but the claims are "fully independent" of publishing and do *not* impose liability for third-party content. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021). In *HomeAway*, for example, third-party listings on the rental platforms might trigger a chain of events leading to the booking of unregistered properties, but the ordinance forbidding the real-estate transactions did not "proscribe" or even "discuss" the third-party listings in any way. 918 F.3d at 683. And in *Internet Brands*, there was no allegation that the predators who harmed the plaintiff offline had posted or

transmitted *any* content on the defendant's modeling website, and the sole source of the proposed duty to warn was information about the predators that the site operator obtained from other sources—so the proposed warning did not relate to or affect any content on the site. 824 F.3d at 848, 849, 851-53; *see Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025) (stressing that the duty in *Internet Brands* was unrelated to third-party content on the site); *accord Estate of Bride*, 112 F.4th at 1180-81.

Plaintiffs also offer (at 38) a hypothetical twist on *HomeAway* where online rental services might allow property owners to issue virtual "tokens" that could be redeemed for stays at unlicensed properties. This hypothetical confirms Plaintiffs' misunderstanding of the but-for test *HomeAway* rejected. If rental services are prohibited from processing rentals for unlicensed properties, adding a digital token to the causal chain would change nothing, no more than did the fact that the unregistered properties might have been featured in online listings. *HomeAway*, 918 F.3d at 682-84. The service still would be liable only for the rental transaction—not the listings *or* sales of tokens created by third parties—so Section 230 would not be implicated. But unlike in Plaintiffs' hypothetical, the claims here "necessarily rel[y] on information provided by

third parties"—namely, the virtual chips used to spin animated slots in online games created by third-party developers. *Doe 1*, 174 F.4th at 1168.

5. Exempting from Section 230 any and all claims that would hold online services liable for offering particular kinds of third-party content for a fee would have untenable consequences. In-app payment functions "reduce[] friction" in the online marketplace, SIIA Br. 5-7, and allow artists and creators to monetize their work through services like Patreon, EFF Br. 14-15. If Section 230 no longer protected the provision of content in exchange for payment, "[f]ewer creators would be able to monetize" their work, and less content would be available. *Id.* at 15. As the Computer & Communications Industry Association warns, such a rule would carry harsh consequences for the economy: Weakening Section 230 protections could result in "$440 billion in GDP and 4.25 million jobs" being "lost every decade." CCIA Br. 32.

Those consequences would cut sharply against Congress's enacted objective in Section 230 "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). If Plaintiffs' claims against Meta could proceed simply

because Meta processes payments for a particular type of third-party content (virtual chips), then people could sue Spotify for processing subscriptions to allegedly defamatory podcasts or Audible for allowing sales of books that allegedly contain obscenity, as long as the plaintiff purported to target the "payment processing" instead of the publication itself. Meta Br. 39-40, 60-64. That approach would balkanize the internet, fracturing the marketplace for digital content.

### B. Section 230 Has No Exception for Alleged "Gambling" Content.

Beating a retreat, Plaintiffs ultimately admit (at 32-33) that Meta is "right" that "no one would argue that movie theaters cease to be 'publishers' when they sell tickets" for movies. They similarly conceded in the last appeal that "[o]ffering a subscription or selling a newsletter is quintessentially publishing conduct." Plaintiffs Br. 30, *In re Facebook Simulated Casino-Style Games Litig.*, 2024 WL 2287200 (9th Cir. May 21, 2024) (No. 22-16888). So even Plaintiffs ultimately agree that making content available for a fee is an integral aspect of publishing the content. Yet they insist that this case is different because the third-party content—the online games and virtual chips—allegedly involves gambling. That proposed "gambling" exception has no footing in Section 230.

1. Plaintiffs do not dispute that the virtual chips used to continue playing virtual slot machines in social casinos are "information provided by another information content provider." 47 U.S.C. § 230(c)(1). Nor could they. Meta Br. 37-38. Again, Section 230 applies to "*any* information." 47 U.S.C. § 230(c)(1) (emphasis added). This Court has already read that phrase to include any "content created by others," *Twitter*, 148 F.4th at 640, or "Internet speech," *Roommates.com*, 521 F.3d at 1175. Whatever edge cases might exist under the statute, the information that makes up video games falls within the heartland of online content. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011).

Plaintiffs counter (at 31) that virtual chips are not complex literary works like "a book or a magazine." But Section 230, just like copyright law, does not task judges with formulating requirements of artistic merit. *Cf. Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903). Congress chose the expansive term "any information." 47 U.S.C. § 230(c)(1). The virtual chips, as visual features of video games that perform a function only within that digital world, are indisputably "any information."

Plaintiffs respond (at 26, 29) that their gambling-related claims do not treat Meta as the publisher of third-party content because a "cashier's cage" that "broker[s] illegal gambling transaction[s]" in a casino could not "fairly" be called a publisher. *See also* San Francisco Br. 8. They cite (at 31) cases involving offline businesses, such as bingo halls. *E.g.*, *There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994). But unlike with activities in those brick-and-mortar settings, Meta does not sit behind a physical window accepting dollars in exchange for physical chips, nor does it issue digital tokens that a person can use in a physical, offline casino. *Cf.* Plaintiffs Br. 38. The slots exist in *video games* playable on Facebook that merely simulate casino games, not in real casinos. Meta Br. 8-10.

That distinction is dispositive under Section 230: Virtual chips in video-game casinos are "information provided through the Internet" by "another information content provider" for which Meta cannot be held liable. 47 U.S.C. § 230(c)(1), (f)(3). Even if the chips can be used to simulate casino games, they are part of an online video game developed by a third party—just as a simulated carjacking in *Grand Theft Auto* is still content in a video game. *Cf. Brown*, 564 U.S. at 798-99. Meta simply

accepts payments in exchange for animated third-party content that can be used only to access more animated third-party content, no different from how other games allow in-app purchases to unlock new game levels, power up characters, or (as here) "extend gameplay." 2-ER-176 (¶¶ 61-62). Because publishers routinely provide access to content for money, imposing liability on that basis treats Meta as a publisher under the "common definition of what a publisher does." *Barnes*, 570 F.3d at 1102; *see* pp. 13-14, *supra*.

2. Plaintiffs insist (at 32) that illegal gambling is still illegal gambling even when the alleged gambling consists of digital content within a video game. But Section 230 does not depend on "the name of the cause of action." *Doe 1*, 174 F.4th at 1167 (quoting *Barnes*, 570 F.3d at 1101-02). Although Congress has created exemptions from Section 230 for certain types of claims, none covers gambling-related claims like Plaintiffs'. 47 U.S.C. § 230(e)(1)-(2), (4)-(5).

Nor does third-party content cease to be content just because a plaintiff alleges that the content is harmful or illegal. Section 230 squarely protects providers from being held liable for illegal third-party content. After all, the statute overturned *Stratton Oakmont, Inc. v.*

*Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which imposed defamation liability on such a provider. This Court has consistently applied Section 230 where the underlying third-party content was claimed to be "unlawful" or improper in some respect. *Roommates.com*, 521 F.3d at 1173-74 (comments expressing "discriminatory preferences"); *see, e.g.*, *Grindr*, 128 F.4th at 1153 (sexual material involving minors); *Dyroff*, 934 F.3d at 1098 (speech proposing drug transaction). So as Plaintiffs acknowledge elsewhere (at 15), whether the challenged social casino apps—which allow players to pay to extend gameplay but do not pay out winnings—offer gambling is a disputed merits question that does not affect whether Section 230 bars their claims.

For the same reason, Plaintiffs' invocation (at 51-54) of "interstate federalism" makes no sense. They declare that "the power of the state to enact laws to suppress gambling cannot be doubted." Plaintiffs Br. 2 (quoting *Marvin v. Trout*, 199 U.S. 212, 224 (1905)). But just as a state has the power to proscribe certain activities, it also "cannot be doubted" that Congress may preempt state laws that would impose liability for allegedly unlawful content, including state gambling laws. *E.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478-80 (2018); *AT&T*

*Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 909 (9th Cir. 2002). Here, Congress expressly declared that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). There is no presumption against preemption when applying that express preemption provision. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

3. Neither can Plaintiffs rewrite Section 230 based on unmoored policy concerns, such as how popular these social casino games are. They suggest (at 8) that players spent $6 billion in one year on such games. But even assuming that is true, it is merely a slice of the $82.7 billion spent on in-app purchases in online games. Curry, *Consumer Spending on Apps Surpassed Games for the First Time in 2025*, Business of Apps (Feb. 5, 2026), https://tinyurl.com/ykvkxrra; *see* EFF Br. 6. For example, players spent more than $1 billion on Candy Crush, much more than the largest social casino app. Curry, *Candy Crush Revenue and Usage Statistics*, Business of Apps (Jan. 7, 2026), https://tinyurl.com/3wx9cbh; *see* Plaintiffs Br. 8. Claims that would impose liability for the content bought by these and other players treat online services as publishers of online games.

## II. Plaintiffs' Claims Also Treat Meta as a Publisher by Requiring Monitoring of Third-Party Content.

Plaintiffs' claims treat Meta as a publisher for the additional and separate reason that they would impose publisher duties on Meta, including a duty to monitor what third-party content players can buy on Facebook and how they can use those virtual items within online third-party games. Plaintiffs barely try to defend the district court's effort to avoid the monitoring issue by suggesting that Meta could just eliminate in-app purchases across the board for all kinds of third-party content. Instead, they say Section 230 is inapplicable because Meta need not *moderate* third-party content and, even if it must, it need only monitor *some* third-party content. These responses prove Meta's point. Figuring out what content would or would not be covered by Plaintiffs' proposed rule would itself require monitoring and removal of third-party content—a "quintessential publishing activity." *Twitter*, 148 F.4th at 643.

### A. Plaintiffs Do Not Dispute That Forcing a Provider to Stop All In-App Purchases Is Not a Legitimate Alternative to Monitoring.

The district court agreed that Plaintiffs' claims would require Meta to monitor in-app purchases for alleged gambling content but nonetheless held Section 230 inapplicable on the theory that, rather than engage in

content moderation, Meta could "stop offering [its] own payment processing" for all apps on Facebook. 1-ER-13. Other than taking a swipe at Defendants' size, Plaintiffs do not defend (at 55) the district court's "nuclear option" as a true alternative to monitoring.

For good reason: This Court has repeatedly held that Section 230 bars claims that would impose a duty to monitor even though the online service could theoretically have avoided any monitoring obligation by ceasing to display third-party content in the first place—or ceasing to offer a feature that facilitates access to such content. *E.g.*, *Twitter*, 148 F.4th at 647 (hashtag feature); *Calise*, 103 F.4th at 744 (third-party advertisements); *Roommates.com*, 521 F.3d at 1174 (user descriptions of roommate preferences and rental unit features); *see* Meta Br. 56-57; SIIA Br. 8. And the district court's proposed solution only confirms that the "root" of Plaintiffs' claims is third-party content on the service. *Estate of Bride*, 112 F.4th at 1180.

Reading Section 230 to force online services to choose between monitoring third-party content to identify allegedly improper content and discontinuing all in-app content-purchase functions would fracture the internet. *E.g.*, CCIA Br. 24-25. As the Association for Competitive

Technology explains, the availability of app stores with payment-processing tools has encouraged the internet to grow and allowed small developers to flourish. ACT Br. 3-4, 10-11. The district court opined that Meta itself could weather such a "dramatic upheaval in [its] business." 1-ER-13. But many online communities could not survive if forced to choose between monitoring third-party content and assuming responsibility for all content purchased on an online service. EFF Br. 14-16. Section 230 was meant to ensure that they would not be put to the district court's choice.

### B. Plaintiffs' Theory That Section 230 Forbids Only Duties to "Moderate" Third-Party Content Conflicts with This Court's Decisions and Supports Reversal in Any Event.

Instead of defending the district court's "nuclear option," Plaintiffs offer a revisionist view of this Court's precedents. Time and again, this Court has held that "[a]sking a platform to monitor and review third-party content goes to Section 230's core." *Doe 1*, 174 F.4th at 1167; *see, e.g.*, *Grindr*, 128 F.4th at 1153; *Calise*, 103 F.4th at 742. Plaintiffs also concede (at 40) that the alleged duty not to make virtual chips available for in-app purchase would require "referring to some third-party content"—meaning that Meta would have to monitor the content of video

games for potential "gambling," determine how virtual items could be used within those games, and then deny access to those items that the app developers have listed for purchase. Meta Br. 53-54. Instead, Plaintiffs argue that this Court's cases require more to qualify for protection: not just a duty to monitor, but a duty to *moderate* content "as part of an editorial function." Plaintiffs Br. 40-41; *accord* EPIC Br. 18-20. Plaintiffs lose even under their own test, which in any event conflicts with this Court's decisions.

1. Plaintiffs' strained distinction between monitoring and moderation is academic in this case. At their core, Plaintiffs' claims would require Meta to monitor content being made available for purchase and then refuse to facilitate in-app purchases of particular kinds of content—the same type of "moderation" duty they admit is barred by Section 230.

Prohibitions on the sale of content are indisputably a form of moderation. A law that prohibits bookstores from selling particular works "suppress[es]" content just as much as a law that requires bookstores not to stock the works on their shelves in the first place. *Estate of Bride*, 112 F.4th at 1180; *see Smith*, 361 U.S. at 150; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61 (1963) (invalidating under First Amendment

law that declared particular books and magazines to be "objectionable for *sale*, distribution or display" (emphasis added)).

So too here. A duty not to facilitate the purchase of particular content would require Meta not just to monitor its service to identify that content but to disallow access to it—precisely the type of removal duty that Section 230 undeniably bars. NetChoice Br. 19; *cf. Brown*, 564 U.S. at 789 (invalidating as content discrimination under the First Amendment a law that prohibited the "sale or rental" of violent video games to minors). Even under Plaintiffs' reading, Meta would have to "monitor and review third-party content," *Doe 1*, 174 F.4th at 1167, and then "moderate" (*i.e.*, preclude access to) that content, Plaintiffs Br. 40-41. Section 230 requires no more to bar Plaintiffs' claims.

2. Plaintiffs misread this Court's precedents in any event. This Court has repeatedly held that Section 230 bars claims that would impose publishing duties such as monitoring, even when the defendant had no further duty to "moderate" third-party content in the sense of removing it from the service. In *Twitter*, this Court held that a challenge to a search function that allegedly allowed users to search for unlawful content would have required Twitter to "monitor" content (the search

results) even though the plaintiff did not allege that Twitter would have to remove or block the offending third-party posts. 148 F.4th at 647. In *Grindr*, Section 230 barred claims that would have required a dating app to monitor third-party content for the purpose of "suppress[ing] matches and communications," not removing content. 128 F.4th at 1153.

This case involves monitoring in the same sense. Meta would have to monitor the content of third-party apps to determine whether virtual items made available for purchase can be "gambled" within the games. That monitoring would occur by *legal* compulsion—as a duty that attaches when making content available for in-app purchase—not just as the most sensible option "from a business perspective." Plaintiffs Br. 47. And Meta would then have to refuse to allow players to pay for access to just one type of third-party content: virtual chips.

In their effort to redefine "monitor" as "moderate," Plaintiffs seize (at 41) on this Court's statement in *Estate of Bride* that Section 230 precludes claims that would require an online service to "moderate content to fulfill its duty." 112 F.4th at 1177. But no one disputes that Section 230 *does* prohibit the imposition of a duty to moderate in the sense of a duty to locate and remove objectionable content. In *Estate of Bride* itself, the

Court held that Section 230 barred a duty-to-warn claim because the only subject of the warning would have been online third-party content. *Id.* at 1180. This Court has never suggested, in *Estate of Bride* or elsewhere, that a duty to monitor exists *solely* when an online service must not only monitor content, but also remove it. To the contrary, *Estate of Bride* asked more broadly whether the duty "would necessarily require an internet company to *monitor* third-party content." *Id.* at 1177 n.3 (emphasis added). And cases like *Grindr* and *Twitter* confirm that duties to monitor include duties to review content made available through particular features, not just moderation at the level of the entire online service.

Plaintiffs' proposed test is not only inconsistent with this Court's monitoring cases, but also circular. The alleged duty to monitor *is* what treats Meta as a publisher. Section 230 of course protects online services when they monitor content "in the manner that a publisher exercises editorial discretion over the content of a publication." Plaintiffs Br. 40. But Section 230 also protects online services when they do *not* exercise editorial discretion over what content appears online. By barring online services from being "treat[ed]" as "publisher[s]," 47 U.S.C. § 230(c)(1), Congress opted for a regime of self-regulation when it comes to the

monitoring of "objectionable content," H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.) (citing *Stratton Oakmont*); *see Calise*, 103 F.4th at 739. Imposing a duty to monitor third-party content would strike at the core of that congressional balance, even without a duty to take further moderation action.

3. Nor are Plaintiffs correct (at 48) that monitoring third-party content made available for purchase within online apps would be just like the "distinct, internal, and nonpublic" requests to book rental properties in *HomeAway*. 918 F.3d at 682. The requests to complete in-app purchases may themselves be internal and nonpublic, just like a request to buy an e-book, subscribe to a newsletter, or rent a movie. But Meta could not determine the transaction's legality from the mere fact that someone tries to complete an in-app purchase. Plaintiffs argue (at 11) that only a tiny subset of in-app purchases is unlawful: virtual chips that are "substantially" likely to be used to play simulated casino games that allegedly constitute gambling. 2-ER-177 (¶ 63). If the virtual chips were substantially likely to be used for different games (such as bingo) instead of animated slots, then Meta would not have a duty to refrain from allowing access to the chips for money. Meta thus would have to review both the

content selected for purchase and the video games to determine whether it could accept money from the player in exchange for the virtual item.

Plaintiffs next contend (at 45) that the online services in *HomeAway* also "had to use the published, third-party content within th[e] listing [of a rental property] to determine whether the property was licensed before completing the transaction." That is flatly wrong, as confirmed by Plaintiffs' failure to cite any statement to that effect in *HomeAway* itself. The online services there argued that the zoning ordinance violated Section 230 because, as a practical matter, they would have no choice but to remove third-party listings for unregistered properties that could not legally be booked. 918 F.3d at 682. This Court made clear that the ordinance did *not* require the services "to review the content provided by the hosts of listings on their websites." *Id.* The services there, unlike Meta here, could comply with the law by cross-referencing "bookings against Santa Monica's property registry," all without ever laying eyes on the third-party content. *Id.*

Plaintiffs criticize (at 53) this Court's reliance on the registry as demanding a modern-day Napoleonic code. But the existence of a registry was a key part of this Court's determination that the online services

there would have no need or duty to monitor third-party listings. SIIA Br. 10-11. No such alternative to monitoring third-party content exists here because the legality of any transaction depends entirely on the nature of the purchased content. As a result, Plaintiffs' claims would require Meta to monitor not just the transaction requests but also "the content provided" by third-party app developers for purchase—precisely what *HomeAway* said would trigger Section 230. 918 F.3d at 682.

## CONCLUSION

The Court should reverse the district court's order denying in part Meta's motion to dismiss and remand with instructions for the court to dismiss Plaintiffs' amended master complaint with prejudice.

Dated: August 31, 2026

Respectfully submitted,

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

*Counsel for Defendant-Appellant Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Circuit Rule 32-1(b) because it contains 6,921 words, excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated: August 31, 2026

Respectfully submitted,

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.