Nos. 25-7916, 25-7917

# United States Court of Appeals for the Ninth Circuit

IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

FRANK CUSTODERO, ET AL.,
*Plaintiffs-Appellees,*
v.
APPLE INC.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of California,
No. 5:21-md-02985-EJD (Hon. Edward J. Davila)

## REPLY BRIEF FOR APPLE INC.

Marina A. Masterson
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131
(305) 577-3168
Marina.Masterson@weil.com

Mark A. Perry
Zachary D. Tripp
Crystal L. Weeks
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Suite 600
Washington, DC 20036
(202) 682-7000
Mark.Perry@weil.com

*Counsel for Apple Inc.*

## TABLE OF CONTENTS

Argument ........ 1

I. Plaintiffs Assert a Duty To Forbear From Distributing Certain Content for Pay ........ 2

II. Section 230 Bars Plaintiffs' Claims ........ 4

A. The Asserted Duty Depends on Published Third-Party Content ........ 5

1. If the content distributed for pay were different, the duty would not arise ........ 5

2. The virtual chips and apps at issue are "information provided by another information content provider" ........ 7

3. Third-party content is not merely a but-for cause of liability under Plaintiffs' theory ........ 9

B. The Asserted Duty Springs From Distribution of Content for Pay, Not Independent Financial Services ........ 12

1. The duty springs entirely from publishing activity ........ 12

2. There is no for-pay exception to Section 230 ........ 14

3. Plaintiffs' other arguments and analogies lack merit ........ 16

C. The Asserted Duty Would Require Apple to Monitor Published Third-Party Content ........ 17

1. The Court requires "monitoring," not "moderating," but regardless, Plaintiffs' duty requires both ........ 18

2. Plaintiffs fail to show any alternative to monitoring ........ 21

3. Plaintiffs' proposed "nuclear option" confirms the applicability of Section 230 ........ 24

D. Section 230 Protects Apple From Liability for Third-Party Use of Neutral Publishing Tools ........ 26

III. Plaintiffs' "Brokering Illegal Gambling Transactions" Label Does Not Circumvent Section 230 ........ 28

Conclusion ........ 29

Certificate of Compliance ........................................................................ 31

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 2

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .......... 1

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 9

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... *passim*

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......... 15

*Close v. Sotheby's, Inc.*,
894 F.3d 1061 (9th Cir. 2018) .......... 15

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .......... 26, 27

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......... 10

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .......... *passim*

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) .......... 25, 26, 27

*Dyroff v. Ultimate Software Grp.*,
934 F.3d 1093 (9th Cir. 2019) .......... 5, 26, 27

*Estate of Bride ex rel. Bride v. YOLO Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .......... *passim*

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......... 15, 16

*Green v. Am. Online (AOL)*,
318 F.3d 465 (3d Cir. 2003) .......... 8

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) .......... 18

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .......... 18, 19, 20

*Kater v. Churchill Downs Inc.*,
886 F.3d 784 (9th Cir. 2018) .......... 22, 23

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) .......... 3

*Patel v. Garland*,
596 U.S. 328 (2022) .......... 7

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) .......... 14, 15, 16

*There to Care, Inc. v. Comm'r of Ind. Dep't of State Revenue*,
19 F.3d 1165 (7th Cir. 1994) .......... 9

*Twitter Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 27

**Statutes**

Communications Decency Act of 1996, Pub. L. No. 104-104,
Tit. V, 110 Stat. 137

47 U.S.C. 230(b)(1) .......... 1, 24

47 U.S.C. 230(b)(2) .......... 1, 24

47 U.S.C. 230(c)(1) .......... *passim*

47 U.S.C. 230(c)(2) .......... 14, 18

47 U.S.C. 230(e)(3) .......... 23

47 U.S.C. 230(f)(3) .......... 15, 17

**Other Authorities**

U.S. Const. amend. I .......... 9

*Monitor*, Merriam-Webster's Unabridged Dictionary .......... 17

## ARGUMENT

Section 230 depends on substance, not labels. Here, Plaintiffs' claims all arise from the contents of apps, games within the apps, and virtual chips used to play those games—in the language of the statute, "information provided by another information content provider." 47 U.S.C. 230(c)(1). Holding Apple liable for distributing content to iOS users for pay would treat Apple as a publisher of that information, require Apple to monitor published third-party information to make judgment calls regarding lawful and unlawful transactions, and punish Apple based on its provision of content-neutral publishing tools for distributing third-party information for pay. Section 230 precludes that result on its own terms and under all of this Court's precedents.

Plaintiffs' arguments also flout Section 230's stated purposes. Contrary to Plaintiffs' revisionist argument that Congress created Section 230 solely to protect editorial discretion over user-generated content on messaging boards, *see* Br. 1, Congress actually passed Section 230 "to promote the continued development" of platforms, 47 U.S.C. 230(b)(1), "to preserve the vibrant and competitive free market" for the internet, 47 U.S.C. 230(b)(2), and thus "to promote the development of e-commerce," *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003). Accepting Plaintiffs' position in this case would seriously undermine those purposes. Congress could have added an exception for gambling-related content, or created an exception for publishing content for pay, but it did neither. Section 230 bars all of Plaintiffs' claims.

## I. Plaintiffs Assert a Duty To Forbear From Distributing Certain Content for Pay

The conduct that the district court found to fall outside Section 230—and therefore the only relevant conduct underlying any asserted duty—is that Apple "operates as the payment processor for all in-app purchases of virtual chips." 1-AppleER-12; 3-AppleER-255. The Complaint defines payment processing to mean three concrete acts: Apple (1) "collects the money players spend" for the delivery of in-app content to their iOS device; (2) "takes a cut" based on its standard commission for its role in distributing it; and (3) "remits the rest" to the developers. 3-AppleER-255. And the Complaint's core allegation is that such collection of payment for in-app content violates the state laws at issue if the content is an in-app virtual chip *and* Apple knows the virtual chip is "substantially" likely to be used later to play certain social-casino video games on an iOS device in a state where that is unlawful. Br. 11 (citing 3-AppleER-255).

Plaintiffs have consistently mischaracterized Apple's actions—and their own Complaint—to avoid Section 230. They now insist that Apple is liable for "brokering illegal gambling transactions." Br. 2. But that label does not change the actual allegations in the Complaint. "[A] plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102-03 (9th Cir. 2009); *see*

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting attempt at "artful skirting" of Section 230).[1]

Plaintiffs' own allegations show that the "brokering illegal gambling transactions" label is artificial. Apple provides a general-purpose platform for distributing and selling apps and in-app content to iOS users and charges a standard "commission off of every in-app purchase." 3-AppleER-258. Developers use the platform to distribute and sell a vast array of apps and in-app content, including subscriptions to streaming apps, video-game avatars, and virtual currencies for accessing digital invitations. *See, e.g.*, 2-AppleER-242-244. Here, some third-party developers created apps simulating casino games and decided to sell virtual chips to use within those apps. 3-AppleER-255.

Apple's alleged conduct in providing that platform for distributing and selling apps and in-app content to iOS users, and failing to block or remove developers who use it to sell these virtual chips, is a far cry from "brokering illegal gambling transactions." Purchasing virtual chips involves no element of chance or risk; users get what they pay for. Apple does not participate in any later transaction in which players exchange virtual chips for spins of

[1] Plaintiffs have repeatedly tried to use labels to get around Section 230. *See, e.g.*, 2-AppleER-133 (arguing Apple is a "bookie," then abandoning that label); 2-AppleER-109 (characterizing the platforms as "proprietors" and "stakeholders"). Even here, they misleadingly describe Apple as operating a "cashier's cage." Br. 9; *see* p. 17, *infra*.

simulated-slot games. And Plaintiffs nowhere allege that Apple has a role in determining any of the content or pricing contained in the apps at issue.

In sum, the Complaint asserts that it is unlawful for Apple to distribute this particular kind of in-app content for pay. And that is precisely the conduct that Apple addressed in its opening brief and demonstrated that Section 230 protects.[2]

## II. Section 230 Bars Plaintiffs' Claims

Plaintiffs have no meaningful response to Apple's showing that each of this Court's Section 230 tests bars their claims.

First, Section 230 applies because Plaintiffs' claims "depend on the content of third-part[ies]." *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1168 (9th Cir. 2026). If the apps or in-app content were different, the duty would disappear. Second, the alleged duty "springs from" Apple's status and

[2] Plaintiffs assert there is "little point in resolving this interlocutory appeal" because the district court granted them leave to amend. Br. 22. But the court did not grant Plaintiffs leave to amend, 1-AppleER-38, and Plaintiffs did not amend in the nearly three months before this Court granted interlocutory appeal. Regardless, the district court found that the Section 230 issue would "resolve[] [the case] in its entirety." 1-AppleER-74. Indeed, after this Court accepted the interlocutory appeal, the district court stayed the case because "the Section 230 issue has the potential to terminate the actions in their entirety." Order Staying Case Pending Interlocutory Appeal, No. 5:21-md-02985, (N.D. Cal. June 1, 2026), Dkt. 198 at 5. Elsewhere in their brief, Plaintiffs admit the Section 230 issue is dispositive by asserting that the same duty underlies *all* of the claims that they might assert. Br. 21-25. The Section 230 issue is thus ready for this Court's resolution.

conduct as a publisher, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024), because it springs from Apple's distribution of this allegedly objectionable content for pay—and distributing content for pay is the defining conduct of the publishing industry. *See* Apple Br. 31-37. Third, Apple would need to "monitor third-party content" to distinguish lawful from allegedly unlawful transactions for in-app content. *Calise*, 103 F.4th at 742; Apple Br. 37-41. And fourth, Plaintiffs' claims would treat Apple as a publisher because they would hold it liable for third-party use of its "neutral tools" that are "meant to facilitate the communication and content of others." *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

### A. The Asserted Duty Depends on Published Third-Party Content

#### 1. If the content distributed for pay were different, the duty would not arise

Notably, Plaintiffs do not dispute that Apple could distribute *any other type of content* to iOS users for pay and the duty they rely on would not arise. That confirms that the asserted duty "depend[s] on" third-party content. *Doe 1*, 174 F.4th at 1168; *see Estate of Bride ex rel. Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024) (Section 230 protects platforms "from liability for any of the [third-party] content posted on their services").

Plaintiffs' own examples prove the point. In the prior appeal, they admitted that "[o]ffering a subscription or selling a newsletter is

quintessentially publishing conduct." Appellee Br., *In re Apple,* No. 22-16914, (Oct. 25, 2023), Dkt. 44 at 30. They do not disavow that admission, and now describe distributing the New York Times crossword puzzle as "innocuous." Br. 5. Apple could collect payment for distributing any other content—such as a newspaper subscription or crossword puzzle—without triggering the asserted duty.

Nor do Plaintiffs allege that transactions for virtual chips are inherently unlawful. Countless apps (such as Paperless Post) sell virtual currencies for lawful in-app content, and Plaintiffs' alleged duty would not reach those transactions. Apple Br. 25. If the New York Times sold virtual chips to access the crossword puzzle, that would be innocuous. Under Plaintiffs' theory, the duty arises only when the user buys a "virtual chip" *and* the app is designed in such a way that the user is "substantially" likely to use the chip to play simulated slots inside a "social casino app." *See* Br. 11.

Even within "social casino apps," Plaintiffs do not allege that transactions for virtual chips are always unlawful. If developers added popular non-gambling alternatives so that the chips were no longer "substantially" likely to be used for allegedly unlawful games, then the transactions would fall outside Plaintiffs' theory. *See* Br. 11. The Complaint alleges that the apps contain multiple games, including card and bingo games, 3-AppleER-254-255, but treats only simulated-slot games as allegedly illegal gambling.

Accordingly, transactions for in-app content are allegedly unlawful only when the content distributed consists of virtual chips, and the virtual chips are used to play specific games the Plaintiffs have identified as objectionable. The alleged illegality of these transactions for such in-app content necessarily and unavoidably *depends on the content of the app itself*. Section 230 therefore applies because the "theor[y] of harm depend[s] on" third-party content. *Doe 1*, 174 F.4th at 1168.

#### 2. The virtual chips and apps at issue are "information provided by another information content provider"

Plaintiffs' primary argument for avoiding Section 230 is to assert that this case involves gambling conduct, not publishing activity. Br. 29-33. They claim Apple is "shoehorn[ing]" this case into Section 230 by calling the virtual chips "content" even though the distribution of virtual chips does not "resemble[] publishing a book or a magazine." Br. 31. This argument fails because the statutory text hinges on distribution of "information." And it is undisputed that the apps and everything conveyed through the apps—including the games, virtual chips, gaming instructions, and any representations of winning or losing in the games—are all third-party "information."

Section 230's text protects a platform's distribution of "*any information* provided by another information content provider." 47 U.S.C. 230(c)(1) (emphasis added). "[T]he word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022) (citation omitted). And the term "information"

does not impose any requirement about the degree of expressiveness or what ideas (if any) are communicated. If Congress intended to exclude certain *types* of digital information, or to apply only to content that "resembles" "a book or a magazine," Br. 31, it would have said so.

For example, in *Green v. America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003), the Third Circuit held that Section 230 barred claims against a platform where some users used chatrooms to send computer viruses to other users. The plaintiff argued that the statute only applies to "communication or reception of knowledge or intelligence, and not an unseen signal that halts someone's computer." *Id.* at 471. The Third Circuit disagreed, holding that the statute reaches any kind of "information," even unseen viruses. *Id.*

In any event, Plaintiffs' suggestion that Apple is mischaracterizing the apps and virtual chips as "content" fails on its own terms. The Complaint shows that these apps are replete with content. It includes images of the graphics inside the games. 3-AppleER-248. It emphasizes that developers "update their apps with *targeted new content*." 3-AppleER-248 (emphasis added). And it notes that developers hold patents for "dynamic paytables" and that the apps' code determines "how many chips players receive for various spin outcomes." 3-AppleER-256. The video games, simulations, and rules are all third-party "information" covered by Section 230.

Plaintiffs rely on *There to Care, Inc. v. Commissioner of Indiana Department of State Revenue*, 19 F.3d 1165 (7th Cir. 1994), to argue gambling is not speech. But that case involved conventional bingo games with real-money payouts. Moreover, unlike the bingo-organizer there, Apple does not participate in the alleged gambling itself because Apple is not involved in the transaction exchanging virtual chips for spins of allegedly illegal slots. Apple only enables third parties to distribute virtual chips to iOS users in an earlier transaction, the same way it enables distribution of in-app content for pay to iOS users in countless other apps.

The Supreme Court's decision in *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790-98 (2011), reinforces that these video games involve content. Plaintiffs nowhere explain why a video game that simulates violent crime is sufficiently expressive to warrant full First Amendment protection, as *Brown* holds, yet a video game that simulates casino-style games would not involve "content" at all.[3]

**3. Third-party content is not merely a but-for cause of liability under Plaintiffs' theory**

Plaintiffs assert that, when Apple argues that its liability "inextricably depends on" third-party content, Apple is advocating a "'but-for' test that

---

[3] Although Plaintiffs ask the Court to "disregard" the First Amendment problems their position creates, Br. 33 n.6, the canon of constitutional avoidance cuts strongly against Plaintiffs' proposed sea-change in Section 230's protection. *See* Apple Br. 56-58.

would provide immunity … solely because a cause of action would not otherwise have accrued but for the third-party content." Br. 33-34 (citation omitted). That is incorrect.

Claims that depend on third-party content are very different from claims in which publication is merely a but-for cause. For example, imagine a person buys a video game because they like the storyline, and the store fails to collect a generally applicable sales tax. The video game's storyline is a but-for cause of the store's violation because, without it, the customer would not have made the purchase that triggered the duty to collect the sales tax. But the duty to collect sales tax is independent of the game's content; that duty is generally applicable. In contrast, if the sale also triggered a hypothetical state-law duty not to distribute violent video games, then the content would not only be a but-for cause. The duty would *depend on* content because the information encoded in the video game itself would define whether the sale is lawful.

This Court has consistently drawn this same distinction under Section 230. It has rejected efforts to apply Section 230 where publication of content is merely a step in the causal chain but the duty is independent of content. For example, in *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016), this Court held that Section 230 did not apply to a failure-to-warn claim against a modeling platform, where assailants viewed a model's

published profile and subsequently lured her to a sexual assault. The published profile was a but-for cause of the assailants' choice to target her, but the platform's own duty to warn was independent of content because its knowledge of the risk arose from "information [the platform] obtained from an outside source" rather than from her post or any other published content. *Id.* at 851.

Conversely, this Court has consistently held that Section 230 applies where the duty "depends on" allegedly objectionable third-party content, *i.e.*, where content itself differentiates lawful from unlawful conduct. For example, in *Doe 1*, 174 F.4th 1159, this Court recently held that Section 230 barred holding a platform liable for harms caused by users posting hateful and discriminatory content. *Id.* at 1163-64. The case was "about the content of third-party posts," and the harm "at the root of [p]laintiffs' claims" arose from third-party content itself. *Id.* at 1168 (citation omitted). As this Court put it in *Estate of Bride*, "[Section] 230 protects [platforms] which receive content posted by third-party users … from liability for any of the content posted on their services." 112 F.4th at 1175.

Under *Estate of Bride* and *Doe 1*, the publication of third-party content is not merely a but-for cause of the alleged harm in this case; it supplies the *sole criterion* that differentiates lawful from unlawful transactions for in-app content. If the content is different, the transaction is lawful. This case thus

is "about the content of third-party [apps]," and the harm "at the root of [p]laintiffs' claims" comes from content, *Doe 1*, 174 F.4th at 1168, so Section 230 applies.

### B. The Asserted Duty Springs From Distribution of Content for Pay, Not Independent Financial Services

#### 1. The duty springs entirely from publishing activity

The Complaint also confirms that the asserted duty "springs from" Apple's distribution of apps and in-app content for pay, which is publishing activity. *Calise*, 103 F.4th at 742. The Complaint alleges that Apple is liable because it (1) "collects the money" for distributing this allegedly objectionable content to iOS users; (2) "takes a cut" for doing so; and (3) "remits the rest" to the creators. Apple Br. 27-28 (quoting 3-AppleER-255). Notably, Plaintiffs *do not dispute* that collecting money for content, taking a cut, and remitting the balance to the creator—that is, distributing content for pay—is publishing activity. Because the claims are based on that exact activity, the duty springs from Apple's status and conduct as a publisher.

Plaintiffs are wrong to assert that the duty "springs from" Apple's "business" of "conducting financial transactions in a highly regulated context without the required license and in violation of state law," rather than publishing. Br. 30. Plaintiffs are once again using misleading labels to mischaracterize Apple's operation of the App Store—which enables the distribution and sale of a vast range of apps and in-app content—as gambling conduct.

But every alleged connection between Apple and purported gambling arises from Apple's provision of a platform that some developers have chosen to use to distribute and sell casino-themed video-game content to iOS devices. As it does for all apps, Apple collects payment for in-app purchases of digital content, takes a cut for distributing it, and remits the balance to the developer.

The collection of funds for distributing content to iOS users is inseparable from the distribution of that content for pay. Apple's collection of money is *for published content* (the virtual chip distributed to an iOS user); Apple takes a cut *for distributing it*; and Apple remits the balance to the developer who created it. *See* 3-AppleER-258. Every financial step is integral to the distribution of content for pay. Just like a bookstore, Apple cannot distribute content for pay without collecting payment for that content.

Plaintiffs' contention that the duty is independent of publishing further fails because the Complaint nowhere alleges that Apple provides stand-alone financial services to these developers, disconnected from publishing. As Apple emphasized, every surviving count alleges Apple also "operat[es]" or "mak[es] available" the apps, which requires publishing them. Apple Br. 9; *see also* Apple Br. 22, 26. Plaintiffs ignore these allegations, which confirm Apple is fundamentally unlike "PayPal, Square, and Stripe." 1-AppleER-12. Apple distributes content to iOS devices for pay. Those services do not.

Plaintiffs' contentions about knowledge confirm that the duty springs from publishing conduct. Plaintiffs do not allege a strict-liability duty; they allege "all of the platforms know" that "substantially all" of these chips "are for the purpose of gambling." Br. 11; *see* 3-AppleER-251, 3-AppleER-262. But what is the source of Apple's knowledge? The answer in the Complaint and Plaintiffs' brief is Apple's "rigid[]" and "close[]" review of third-party apps. 3-AppleER-260-261. Plaintiffs' amici emphasize Apple's monitoring, *see* San Francisco Br. 11-12, EPIC Br. 35, which Plaintiffs seek to use as a sword to establish knowledge and therefore hold Apple liable.

Plaintiffs thus seek to impose liability *because Apple has engaged in good-faith monitoring of content*—which Apple could avoid by halting its monitoring entirely to avoid gaining that knowledge. That is precisely the "grim choice" Congress enacted Section 230 to eliminate. *Estate of Bride*, 112 F.4th at 1175.[4] And because monitoring content is publishing activity, *Calise*, 103 F.4th at 742, this confirms that the duty springs from Apple's status and conduct as a publisher and not merely a financial intermediary.

### 2. There is no for-pay exception to Section 230

Plaintiffs concede that this Court "appl[ied] Section 230 immunity to a defendant who processed payments" for third-party content in *Perfect 10 v.*

[4] Plaintiffs' claims thus not only "treat" Apple as a publisher in violation of Section 230(c)(1), but also hold it liable "on account of" its "good faith" efforts to block "objectionable" content, in violation of 47 U.S.C. 230(c)(2).

*CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007). Br. 34-36. Unable to distinguish *Perfect 10*, they assert it is "no longer good law." Br. 36. They contend that *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008), indirectly overruled *Perfect 10*. But *Roommates* reinforces *Perfect 10* by confirming that Section 230 applies to the distribution of content for pay: *Roommates* held that Section 230 applies to third-party "Additional Comments" that were allegedly unlawful yet were available only to paid subscribers. 521 F.3d at 1162, 1173-74. Both *Roommates* and *Perfect 10* thus confirm that platforms do not lose Section 230 protection when they collect payment for the distribution of third-party content.

The portion of *Roommates* that Plaintiffs rely upon is irrelevant. *Roommates* clarified that *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), does not mean that a platform is "automatically immune so long as the content originated with another information content provider." *Roommates*, 521 F.3d at 1171 n.31. Rather, a platform can be liable for information "supplied by third parties" if it "contribute[d] to the content's illegality." *Id.* at 1171 (citing 47 U.S.C. 230(f)(3)). But that is irrelevant to *Perfect 10* because, as here, third parties were exclusively responsible for the allegedly illegal nature of the content at issue. *Roommates* thus is not "clearly irreconcilable" with *Perfect 10*. *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (citation modified) (discussing standard for when authority is

"effectively overruled"). Rather, *Roommates* supports *Perfect 10* on the key point here.

### 3. Plaintiffs' other arguments and analogies lack merit

In places, Plaintiffs focus on whether the "right" springs from publishing, rather than the "duty." *E.g.*, Br. 26. But both the asserted duty and correlative right spring from the same publishing activity. The Complaint alleges that Plaintiffs purchased in-app virtual chips from developers of these video games via the App Store so that they could play these games on their iOS devices without waiting for free chips. They demand that Apple return the funds they spent to obtain that content because, they claim, the games are illegal. *See* Br. 11. But a right to recoup money *spent to obtain content distributed to an iOS device*—and any duty not to *distribute such content to users of iOS devices* for pay—spring from the same conduct: Apple's distribution of third-party content for pay to these users' iOS devices.

Contrary to Plaintiffs' position, Apple is not arguing that, "because bookstores can charge money for books, financial transactions are actually publishing," such that a bookstore would be engaged in publishing when it sells "croissants." Br. 50; *see also* Br. 26. Transactions for actual croissants do not involve publishing because food is not "information." 47 U.S.C. 230(c)(1). But a *digital image* of a croissant, or a virtual chip in a video game that an avatar uses to buy a *virtual* croissant, is "information." So Section 230 would

apply to those transactions because Apple would be facilitating the distribution of that digital content for pay to an iOS device.

Plaintiffs' assertion that Apple is operating the "cashier's cage" is likewise baseless and does not separate their claims from publishing. Developers created video games depicting casinos, but Apple did not create those games "in whole or in part." 47 U.S.C. 230(f)(3). Nor is Apple involved in the transaction where players exchange in-app virtual chips for in-app spins. Apple's conduct toward these developers is the same as to millions of others: Whether the content takes the form of an owl teaching a foreign language, crossword puzzles, wedding invitations, or virtual chips for use in video games, it is Apple's distribution of published content for pay. Section 230 therefore applies.

### C. The Asserted Duty Would Require Apple to Monitor Published Third-Party Content

Section 230 also applies because the asserted duty "obliges the defendant to 'monitor third-party content.'" *Calise*, 103 F.4th at 742. Plaintiffs *concede* that differentiating lawful from unlawful transactions "may require [Apple to] refer[] to some third-party content" and "look[] at third-party content." Br. 26, 40. "Looking at" content and "referring to" content to assess legality are ways of monitoring that content. *E.g.*, *Monitor*, Merriam-Webster's Unabridged Dictionary ("to watch, observe, or check especially for a

special purpose"). The asserted duty thus would require Apple to monitor, and Section 230 applies.

### 1. The Court requires "monitoring," not "moderating," but regardless, Plaintiffs' duty requires both

Plaintiffs argue that "monitoring" is insufficient and that Section 230 is only triggered if the platform must "moderate" content and "exercise[] editorial discretion." Br. 40-41 (quoting *Estate of Bride*, 112 F.4th 1168). But Plaintiffs' asserted duty fails their own test because it does require moderation. *Estate of Bride* refers to "moderating content in some way, whether through deletion, change, or *suppression*." 112 F.4th at 1180 (emphasis added). Plaintiffs' duty would require Apple to block the distribution of this specific content for pay. And blocking authors from collecting payment for disfavored works—or starving publishers of revenue for distributing it—are classic ways to suppress the free flow of information and thereby moderate content. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 245 (1936) (tracing the "long" history of such efforts back to the 17th Century and striking down a more recent one); CCIA Br. 27-34. Section 230 therefore is triggered even under Plaintiffs' own formulation.

In any event, *Estate of Bride* does not silently alter the "monitoring" test discussed in *Calise*, *HomeAway*, and this Court's other Section 230 cases. *Estate of Bride* used "moderate" when introducing Section 230 as a whole—including subsection (c)(2), which protects good-faith efforts to moderate

access to objectionable material. 112 F.4th at 1175. When articulating the inquiry under subsection (c)(1)—the provision here—this Court asked whether the duty "would necessarily require an internet company *to monitor* third-party content." *Id.* at 1177 n.3 (emphasis added) (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)). *Estate of Bride* thus recognized that Section 230(c)(1) is triggered when a platform must "monitor" to distinguish lawful from unlawful conduct.

This Court recently explained that "[a]sking a platform to monitor and review third-party content goes to Section 230's core." *Doe 1*, 174 F.4th at 1167. Even *HomeAway* referred to the "monitoring" duty as one that would "require the [p]latforms to review the content provided" by third parties. 918 F.3d at 682. This Court's cases thus foreclose Plaintiffs' effort to change "monitoring" to "moderation."

Plaintiffs argue that Apple would "not need to monitor every listing on [its] website," but rather could examine "incoming requests to complete a … transaction." Br. 48. They assert that this would be "distinct, internal, and nonpublic," and would fall outside of Section 230's coverage under *HomeAway*, 918 F.3d at 682. Br. 48. That is wrong.

First, *HomeAway* involved rental platforms that booked *real* estate, not transactions for "information provided by another information content provider." *See* pp. 7-9, *supra*. By contrast, every transaction here is for published

digital "information" itself, which means monitoring those requests is not "distinct" from publishing. *See HomeAway*, 918 F.3d at 682; Apple Br. 6. Rather, transactions to exchange money for content are the core business activity of the publishing industry. Apple Br. 31-35.

Second, unlike in *HomeAway*, Apple cannot determine the legality of the transaction by comparing the transaction request to an exogenous government registry of illegal apps, games, or transactions. *See* Apple Br. 50 n.7 (explaining that, when the government has enacted laws identifying specific apps that cannot be distributed, Apple has complied). No such registry exists in *any state*, much less all 50. Moreover, even if monitoring a transaction request showed that it is for a virtual chip, that would still be insufficient to determine the legality of the transaction. Apple would need to monitor the content of the underlying app itself because the alleged duty only applies if the transaction is for virtual chips *and* the chips are substantially likely to be used to play certain games. *See* p. 6, *supra*. So Apple could not comply by comparing an internal record to a registry; Apple would need to monitor published content itself and make independent judgment calls about what transactions for the distribution of content to approve or deny.

Contrary to Plaintiffs' assertions, Apple's position does not mean that the rental platforms in *HomeAway* could evade liability by selling "tokens" which could later be used in a second transaction to redeem housing. Br. 38.

The transaction to exchange the token for housing would still be a transaction for real estate, not "information," and the platform could still comply by looking at the government registry, not published content. So the token would be irrelevant.

### 2. Plaintiffs fail to show any alternative to monitoring

Plaintiffs propose various alternatives to suggest that the duty does not require monitoring published third-party content, but none suffices.

First, Plaintiffs argue Apple could monitor transactions by "social casino app developers," Br. 49, but they tellingly do not provide a comprehensive list of such developers. Indeed, Plaintiffs assert that the allegedly illegal apps "includ[e]"—but are not limited to—the "roughly 50 specifically identified in the pleadings." Br. 6; 3-AppleER-251 (confirming Plaintiffs' list of apps is non-exhaustive). And any such list could continually change. A "social casino app developer" could change an app from one day to the next to remove all slot games. Other developers with unrelated apps could choose to add a slot game or element of chance at any time. Apple would only know a duty had been triggered by monitoring published third-party content, so Section 230 would still apply.

Second, even comparing a list of "social casino app developers" to transaction requests would be insufficient. The same developer could also distribute and sell apps and in-app content that have nothing to do with simulated

gambling. So Apple would still need to monitor to determine that it is a social-casino app. And even that would be insufficient. If the app included popular non-gambling options, the chip would no longer be "substantially" likely to be used to play the allegedly illegal games and the transaction for the virtual chip would be lawful. *See* p. 6, *supra*. The only way Apple could tell whether the particular social-casino app is one where "substantially" all chips are used to play these games is therefore by painstakingly monitoring to determine how chips can be used in a later transaction and speculating about how popular different options might be. And because developers can update apps, Apple's monitoring would need to be ongoing and continual.

On top of that, Apple would need to make app-specific legal judgments under countless state laws, making the monitoring profoundly burdensome. Apple Br. 38-39. Plaintiffs also provide no definition for their "substantially" likely test, ensuring that this determination would involve guesswork.

Plaintiffs attempt to minimize those burdens by asserting that these games "operate in the same manner, in all material respects," as the game in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018). Br. 6. But the Complaint does not even list the app discussed in *Kater*—"Big Fish Casino"—as one of the "Illegal Slots." 3-AppleER-258. Regardless, Apple would need to monitor the apps to determine whether they operate in the same way. The Complaint suggests they do not. *Kater* emphasized an allegation

that, when users run out of chips, they "must buy more chips" to play. 886 F.3d at 787. The Complaint here instead alleges that users can obtain more chips—for free—by "wait[ing]." 3-AppleER-255.

In any event, *Kater* addressed the law of a single state (Washington). And because the defendant was the developer, *Kater* did not address the legality of a platform distributing virtual chips to iOS devices for pay without participating in any later transaction in which the chip is exchanged for spins. In fact, the district court here dismissed claims based on the Washington statutes underlying *Kater* because Apple was not a proprietor or "winner." 1-AppleER-27-28. Apple would thus need to engage in app-specific and jurisdiction-specific review, resolving open and disputed legal questions, to determine whether chip transactions are illegal in *any* state.

Plaintiffs respond to those serious burdens with a discussion of federalism. Br. 51-54. But Section 230 imposes a uniform federal rule that expressly preempts conflicting state law, 47 U.S.C. 230(e)(3), so the only question is whether Section 230 applies. And Apple is not claiming that compliance burdens, standing alone, trigger Section 230. Rather, Section 230 applies because, among other things, Apple must monitor content to determine which transactions for in-app content are legal. Varying and indeterminate state laws simply add to that burden, which shows how severely Plaintiffs' theory collides with Section 230's objectives. Plaintiffs' view of Section 230 would

create a powerful incentive for platforms to purge third-party content or halt monitoring entirely to avoid liability—defeating the very purpose of Section 230. *See* EFF Br. 16-21; *see also* 47 U.S.C. 230(b)(1), (b)(2).

#### 3. Plaintiffs' proposed "nuclear option" confirms the applicability of Section 230

Plaintiffs further argue that, to avoid a monitoring obligation, Apple could abandon the distribution of in-app content for pay altogether—for all developers, all content, and all iOS users. Br. 55-56. The fact that Plaintiffs call this "the nuclear option" is a telltale sign that Section 230 does not require such drastic measures. That would effectively create a for-pay exception that the text forecloses and that would flout the express statutory purpose of preserving a "vibrant and competitive free market … unfettered by Federal or State regulation." 47 U.S.C. 230(b)(2).

Plaintiffs fail to respond to Apple's point that *Calise* requires examination of the specific duty asserted. Apple Br. 40-41. Here, Plaintiffs assert a narrower duty: a content-based duty to stop only *some* transactions for in-app content, not *all* transactions for in-app content. Distinguishing lawful from unlawful transactions under that narrower duty requires monitoring, so Section 230 applies. By contrast, abandoning all paid distribution is not a method of complying with the specific asserted duty; it eliminates the publishing function to which the duty would apply.

Plaintiffs also fail to address Apple's point that this Court has never considered the "nuclear option" to be an alternative to monitoring. *See* Apple Br. 39-41. For example, that reasoning would have allowed the platform in *Doe 1 v. Twitter, Inc.* to avoid liability by eliminating its hashtag and search functions altogether, even though those are publishing functions. 148 F.4th 635, 646-47 (9th Cir. 2025). This Court instead held that Section 230 applied because, assuming the continued use of the publishing functions, the platform would need to monitor to determine which hashtags were lawful and which were not. *See id. Twitter* thus confirms that the monitoring inquiry focuses on compliance with the specific duty, not whether the platform could altogether abandon the underlying publishing activity. This is the only logical way to apply Section 230 because some form of a "nuclear option" will always be available.

Plaintiffs' position that "monitoring" is not required because Apple could simply distribute content for free also lacks any limiting principle. Apple would be protected for distributing the New York Times for free, but not for "brokering" a subscription to the Times—even though Plaintiffs have admitted that the latter is "quintessentially publishing conduct." *See* Apple Br. 28-30. That is the digital equivalent of protecting a bookstore when it shelves and displays a book, but withdrawing protection whenever the book is sold. *See* NetChoice Br. 15. It would even make Section 230 inapplicable to a strict-

liability defamation claim for distributing third-party content for pay. Yet Plaintiffs' amici admit that shielding platforms from such claims lies at the epicenter of Section 230. *See* EPIC Br. 3-4. So that cannot be right.

### D. Section 230 Protects Apple From Liability for Third-Party Use of Neutral Publishing Tools

Finally, Plaintiffs fail to rebut Apple's argument that Section 230 protects Apple from being held liable for third-party developers' use of its in-app purchasing tools because they are neutral publishing tools, *i.e.*, neutral tools "meant to facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098; *see* Apple Br. 41-44.

First, Plaintiffs assert that neutrality is relevant only to determining who created content. *See* Br. 36. But they miss the broader point that this Court has applied the neutral-tools test, in its entirety, to conclude that Section 230 protects a platform from being held liable for a third party's use of such tools. *See, e.g.*, *Estate of Bride*, 112 F.4th at 1181; *Twitter*, 148 F.4th at 646-47; *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152-53 (9th Cir. 2025); *Dyroff*, 934 F.3d at 1098. As *Twitter* put it, distinguishing "nefarious" from "innocent" uses of neutral publishing tools "would require [the platform] to act as a publisher." 148 F.4th at 646. So too here.

Second, Plaintiffs contend that Apple's in-app purchasing tools do not qualify because they "are not communication or content delivery functions." Br. 36, 38. But that is wrong for multiple reasons. For starters, they *are*

"communication or content delivery functions." They are tools for delivering content to iOS users in exchange for pay. Further, such tools do not need to "deliver[]" communication; they need only "facilitate" communication. *Dyroff*, 934 F.3d at 1098; *Grindr*, 128 F.4th at 1153 (same); *Twitter*, 148 F.4th at 646-47 (same). And Plaintiffs do not dispute that Apple's in-app purchasing tools facilitate communication and content by facilitating developers' delivery and sale of apps and in-app content to iOS users. Apple therefore cannot be held liable when third-party developers use those neutral tools to deliver and sell content that is allegedly illegal.

Fundamental principles of secondary liability law confirm the point. Plaintiffs do not deny that a business ordinarily does not become secondarily liable merely because it knows third parties will commit a wrong using its services, where its relationship with the third parties is "arm's length, passive, and largely indifferent." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 499-500 (2023). Otherwise, "the everyday provision of general commercial services" would become a basis for liability. TechFreedom Br. 10-11. Yet Plaintiffs are trying to do just that—holding Apple liable for providing the same general publishing services to these developers that it provides to millions of others. Plaintiffs have never shown that the seven state consumer-protection laws that remain at issue impose such an extraordinary duty. *See* Apple Br.

25-26, 44-47. But even if they did, that duty would be foreclosed by the "neutral tools" test and all of this Court's other Section 230 tests.

### III. Plaintiffs' "Brokering Illegal Gambling Transactions" Label Does Not Circumvent Section 230

In this Court, Plaintiffs accuse Apple of "brokering illegal gambling transactions" precisely because Apple's actually alleged conduct fits comfortably within the text, purpose, and established construction of Section 230. The protections afforded by Congress turn on substance, not labels. But even accepting Plaintiffs' label, the claims against Apple are barred by Section 230.

First, the "brokering" label does nothing to alter the basic point that the duty "depend[s] on" third-party content. *Doe 1*, 174 F.4th at 1168. Apple's "brokering" of transactions for in-app content becomes allegedly illegal *only if* the transaction is for this particular kind of in-app content (a virtual chip) *and* the app is designed such that the chip will later be used to play this particular kind of video game. It is thus lawful to "broker" a transaction for anything else, including a virtual chip used any other way. *See* Apple Br. 25. Holding a platform liable for "brokering" the distribution of only certain third-party content to device users for pay—depending on the content sold and the app in which it is used, not anything different about Apple's conduct—would treat Apple as the publisher of that content.

Second, the "brokering" label likewise does not change the application of this Court's other Section 230 tests. Apple's role in distributing virtual chips, even if those chips are used to play games that are illegal under state law, would still be part and parcel of the distribution of content for pay—and that is the defining conduct of the publishing industry. Apple still would need to monitor published content to determine whether "brokering" a transaction for in-app content is lawful. And Apple's in-app purchasing tools would still be content neutral and "meant to facilitate the communication and content of others" by allowing developers to sell their content to iOS users.

At bottom, Plaintiffs seek to hold Apple liable because it distributed allegedly objectionable third-party content for pay. That would treat Apple as a publisher of that content. Congress could have chosen to add a for-pay exception or an exception for simulated-gambling video games, but it has not done so. This Court accordingly should apply the law as it stands and hold that Section 230 bars all of Plaintiffs' claims against Apple.

## CONCLUSION

For the foregoing reasons, this Court should reverse the order certified for interlocutory review to the extent it denied the motion to dismiss in part, and remand with instructions to dismiss the Complaint against Apple in full.

Respectfully submitted,

*/s/ Mark A. Perry*
Mark A. Perry
Zachary D. Tripp
Crystal L. Weeks
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Suite 600
Washington, DC 20036
(202) 682-7000
Mark.Perry@weil.com

Marina A. Masterson
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131
(305) 577-3168
Marina.Masterson@weil.com

August 31, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7916, 25-7917

I am the attorney or self-represented party.

**This brief contains 6,849 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *_/s/ Mark A. Perry_* **Date** _08/31/2026_
*(use "*s/[typed name]*" to sign electronically-filed documents)*