**Weil, Gotshal & Manges LLP**

2001 M Street NW, Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

November 10, 2026

**Mark Perry**
+1 (202) 682-7511
Mark.Perry@weil.com

**VIA E-FILING**
Molly C. Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 7th Street
San Francisco, CA 94103

Re: *Custodero v. Apple Inc.*, No. 25-7917 (consolidated with No. 25-7916)
**Oral Argument Date: Nov. 17, 2026**

Dear Ms. Dwyer:

Pursuant to Rule 28(j), Apple Inc. on behalf of all Appellants respectfully submits *Shared Partnership v. Meta Platforms, Inc.*, No. 25-2612 (9th Cir. Oct. 30, 2026) (attached as Exhibit A), which concluded that Shared's claim against Meta was barred by Section 230 because Meta "acted like a prototypical publisher" in terminating Shared's Facebook account and "prevent[ing] [it] from posting advertisements." Slip op. 4, 10.

The plaintiff in *Shared* (like Plaintiffs here) argued that its claim was not precluded under *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024). This Court disagreed, explaining that "commercial activity" can be "captured by the term 'publisher,'" as was the case in *Calise* where "Meta sold the advertising space." *Shared*, slip op. 9-10 (citation omitted). The Court also rejected the plaintiff's attempt to evade Section 230 by "dressing up" a claim that targets publishing conduct in the language of "property rights." *Id.* at 10. Rather than relying on labels, "a court must evaluate" whether a claim treats a platform as a publisher based on "the core theory of the complaint and the nature of the alleged injurious conduct." *Id.* at 13-14.

*Shared*'s reasoning confirms the district court's error in ruling that so-called "payment processing" is categorically beyond Section 230's coverage. Looking past how Plaintiffs have "dressed up" their claims, the core theory actually alleged in the complaint

is that each Platform "collects the money players spend on virtual chips, takes a cut for itself, and remits the rest to the [app developers]." 3-AppleER-255 (¶ 63). Those chips are third-party content, *ibid.* (¶ 65), so the challenged conduct constitutes distributing such content for pay. Distributing content for pay defines the business of publishing, and Section 230 has no for-pay exception. *Shared*, slip op. 9-10. Plaintiffs' attempt to hold the Platforms liable for that conduct therefore treats them as publishers. *See* Apple Br. 27-37. This Court should reverse.

Respectfully submitted,

*/s/ Mark A. Perry*

Mark A. Perry

cc: Counsel of Record

# Exhibit A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHARED PARTNERSHIP,<br><br>*Plaintiff - Appellant,*<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>*Defendant - Appellee.* | No. 25-2612<br><br>D.C. No.<br>3:22-cv-02366-RS<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted August 12, 2026
San Francisco, California

Filed October 30, 2026

Before: Kenneth K. Lee, Salvador Mendoza, Jr., and Ana de Alba, Circuit Judges.

Opinion by Judge Lee

# SUMMARY*

## Communications Decency Act

The panel affirmed the district court's dismissal of Shared Partnership's claim— that Meta Platforms, Inc. (the parent company of Facebook) breached its agreement in its Terms of Service when it canceled Shared's Facebook account—as foreclosed by Section 230 of the Communications Decency Act.

Shared creates and publishes online content, and used several Facebook pages as well as Meta's self-service advertising service for over a decade. Over the years, Shared submitted more than 500,000 ads to Meta for review and hopeful publication. Meta rejected more than 18,000 of them for a variety of reasons. In October 2020, Meta canceled Shared's Facebook pages for repeatedly violating its terms and policies. Shared sued Meta for conversion, among other things, and the district court dismissed the conversion claim under Section 230's protection for publishing third-party content.

Section 230 shields an internet provider, such as Meta, from liability if it acts an a "publisher or speaker" of third-party content. Under Section 230 immunity, a claim must be dismissed when (1) the defendant is a provider of an interactive computer service (2) whom a plaintiff seeks to treat as a publisher or speaker (3) of information provided by another information content provider. Shared contested the

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

second element, and argued that its conversion claim did not treat Meta as a "publisher" of third-party content.

Section 230's defense may not apply if the claim arises out of a contractual duty distinct from an internet provider's role as a publisher. The panel held, however, that the mere existence of a contractual duty is not a talismanic Section 230 loophole. While Shared couched its claim in contractual terms, Meta still acted like a prototypical publisher when it invoked the Terms of Service to terminate Shared's Facebook account. Shared's claim hinged on Meta's publishing authority. Section 230 thus barred Shared's claim.

---

## COUNSEL

Cook Alciati (argued), Gardella Alciati, Washington, D.C.; Seth Wiener, San Ramon, California; for Plaintiff-Appellant.

Eric A. Shumsky (argued), Holly Boux, and Cesar Lopez-Morales, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Nathan D. Shaffer and Catherine Y. Lui, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Jacob M. Heath, Orrick Herrington & Sutcliffe LLP, Menlo Park, California; Kristopher R. Wood, Orrick Herrington & Sutcliffe LLP, Irvine, California; Samantha M. Leff and Meghan Kelly, Orrick Herrington & Sutcliffe LLP, New York, New York; for Defendant-Appellee.

## OPINION

LEE, Circuit Judge:

Section 230 of the Communications Decency Act shields an internet provider from liability if it acts as a "publisher or speaker" of third-party content. 47 U.S.C. § 230. But Section 230's defense may not apply if the claim arises out of a contractual duty distinct from an internet provider's role as a publisher. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742–43 (9th Cir. 2024).

Shared Partnership—an online content creator that specializes in sensationalistic materials—latches onto this Section 230 exception. It contends that Meta Platforms, Inc. (the parent company of Facebook) breached its agreement in its Terms of Service when it canceled Shared's Facebook account and should be held liable for it. We disagree and affirm the district court's dismissal of Shared's claim. The mere existence of a contractual duty is not a talismanic Section 230 loophole. While Shared couches its claim in contractual terms, Meta still acted like a prototypical publisher when it invoked the Terms of Service to terminate Shared's Facebook account. Section 230 thus forecloses Shared's claim.

## BACKGROUND

### I. Factual Background

#### A. Businesses can buy ads on Meta's self-serve advertising service.

Facebook allows users to connect with one another by posting, sharing, and interacting with content like photos, videos, and text. Meta, in turn, earns revenue by selling

advertisements that target millions of Facebook users. For businesses seeking to advertise on Facebook, Meta offers a "self-serve" program in which an advertiser creates an ad campaign without going through a salesperson. The advertiser creates the ad; tells Meta the type of advertising it wants to buy and the amount it wants to spend; specifies the desired audience; and submits the ad for review and potential publication. Then, if Meta accepts the order, it delivers the ad over its services.

But to protect its users, Meta has policies preventing inappropriate ads under its Terms of Service. Meta's self-serve advertising service is governed by several agreements. One of them is the Self-Serve Ad Terms, which "apply to [an advertiser's] use of Facebook Products" and "any order" they "place through the Self-Serve Ad Interfaces." Under these Terms, advertisers agree that Meta "may reject or remove any ad for any reason," and that their "ads must comply with" Meta's "Advertising Policies." The Advertising Policies, in turn, "provide guidance" to advertisers about permissible content, identify options to pursue if their ad is disapproved, and state that Meta may "reject . . . or remove any ad for any reason." Advertisers pay only for ads that are approved and run. Importantly here, the Terms of Service authorize Meta alone to determine when and whether to "suspend or permanently disable access to [the] account."

Meta reviews millions of ads for compliance with its Advertising Policies and relies on a combination of automated machine learning and humans to review submitted ads. If an ad is rejected, Meta notifies the affected advertiser in an email with a link to "Ads Manager"—a portal through which Meta provides additional information

about the rejection. The advertiser can then edit their ad or appeal the decision.

### B. Facebook rejects thousands of Shared's proposed ads.

Shared, a Canadian-based company, "creates and publishes original, timely, and entertaining [online] content." In addition to its own website, Shared used several Facebook pages as well as Meta's self-serve advertising service for over a decade. Its business model depended on using provocative and eye-catching ads to attract views and "clicks" to its website or Facebook pages. As its own employees acknowledge, Shared regularly relied on "scammy" ads and "blatant clickbait." At one point, Shared had approximately 25 million followers on Facebook.

Over the years, Shared submitted more than 500,000 ads to Meta for review and hopeful publication. While most of the ads were accepted, Meta rejected more than 18,000 of them for a variety of reasons, including because ads contained sensational or adult content, focused excessively on a body part, or promoted products or services that used deceptive or misleading practices. Below is an example of a Shared ad that was rejected and the messaging Shared would have received for the rejection: It featured images of wrecked cars and actor Luke Wilson, along with a breathless statement about a "horrific scene" involving a "fatal car crash" and a plea that "[w]e hope he's ok." Facebook rejected it, explaining that it does not allow ads with "shocking or sensational content" including photos that "depict violence."




> "Your ad wasn't approved because it doesn't follow our Advertising Policies.[140] We don't allow ads that contain shocking or sensational content, including ads that depict violence or threats of violence.
>
> **How to fix**: We suggest using a different image or video."[141]

Shared was not satisfied with Meta's explanations for rejecting the ads. Its CEO Jordan Nabigon said that it thought Meta would provide "customized" messaging for every rejected ad that would always allow Shared to edit them into compliance. Shared, however, continued to advertise on Facebook, despite the constant flow of rejections.

This fraught relationship finally ended in October 2020 when Meta canceled Shared's Facebook pages for repeatedly violating its terms and policies.

### II. Procedural History

Shared sued Meta for, among other things, conversion and fraudulent inducement, claiming that Meta's decision to "unpublish[] the Shared [Facebook] Pages" was a business "death sentence." It based the conversion claim on Meta's "unpublishing" the Shared Facebook Pages, over which Shared argued it had an exclusive property right. The district court dismissed the conversion claim under Section 230's protection for publishing third-party content. This appeal followed.

## STANDARD OF REVIEW

We "review de novo the district court's decision to grant a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152 (9th Cir. 2025) (citation modified).

## DISCUSSION

### I. The district court correctly dismissed the conversion claim.

Section 230 bars any claim that treats an "interactive computer service" provider as a "publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). Because Shared's conversion claim seeks to impose liability on Meta for "unpublishing" Shared's Facebook pages, the district court rightly dismissed this claim.

#### A. Section 230 bars the conversion claim.

Section 230 forecloses liability for claims based on "any activity that can be boiled down to deciding whether to

exclude material that third parties seek to post online." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (citation modified). We have thus held that a claim must be dismissed when (1) the defendant is a "provider . . . of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Id.* at 1100–01.

Shared does not contest the first or third elements of Section 230 immunity. But it argues that its conversion claim does not treat Meta as a "publisher" of third-party content. Rather, California law of conversion supposedly imposed on Meta a "duty to not interfere with Shared's property right" in Shared's Facebook pages. And Meta violated that property right by removing those pages, according to Shared.

But "what matters is not the name of the cause of action" but whether it "treat[s] the defendant as the 'publisher . . . ' of [another's] content." *Id.* at 1101–02. Courts applying Section 230 "must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Calise*, 103 F.4th at 740 (quoting *Barnes*, 570 F.3d at 1102). Being a "publisher" includes exercising editorial functions such as "reviewing, editing, and deciding whether to publish *or to withdraw from publication* third-party content." *Barnes*, 570 F.3d at 1102 (emphasis added); *see also Calise*, 103 F.4th at 740 ("[R]emoving content is something publishers do."). And the editorial duties of a "publisher" under Section 230 extend to decisions about advertisements. *See Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1172 (9th Cir. 2026) (Berzon, J., concurring) ("It did not matter that the advertisements in *Calise* were commercial activity. Meta sold the advertising space, and so essentially acted as a

salesperson or marketer. But under this Court's precedent, *Calise* concluded Meta's sales activities are captured by the term 'publisher.'").

Despite dressing up its claim as a cause of action based on property rights, Shared ultimately seeks to hold Meta liable for its publishing activity. In its complaint, Shared explicitly alleged that Meta is liable for "*unpublishing* the Shared Pages within Facebook." Shared also argues in its briefs that Meta's "wrongful act" was "permanently *unpublishing* Shared's pages." Simply put, Shared sued Meta because the latter exercised its publishing prerogative by removing third-party content—i.e., Shared's Facebook pages. Such a decision to remove content and prevent someone from posting advertisements is a quintessential editorial decision protected under Section 230. *See Barnes*, 570 F.3d at 1102–03.

**B. Shared's contract-based claim fails.**

Apparently seeking to benefit from our recent decision in *Calise*, on appeal, Shared recasts its conversion theory as a contract-based claim. 103 F.4th at 743 (holding that Section 230 does not cover certain contract-based claims separate from the defendant's publishing activity). Shared contends that its conversion claim effectively "seeks to hold Meta liable for failing to comply with its promise" not to remove Shared from Facebook "unless Shared 'clearly, seriously, or repeatedly' breached Facebook's Terms or Policies," which Shared claims it did not. This contract-based argument, however, fares no better than the conversion claim.

To start, Shared may not even have a viable contractual basis. The relevant Terms of Service language states, "If we determine that you have clearly, seriously, or repeatedly

breached our Terms or Policies, including our Community Standards, we may suspend or permanently disable access to your account." It appears that this provision gives Meta unilateral authority to determine whether a business has breached the Community Standards.

In any event, even assuming Shared has an enforceable contractual right, *Calise* is of little help because Shared still seeks to meddle with Meta's publishing discretion. *Calise* "appl[ied] the principles we first established in *Barnes*," 103 F.4th at 742. Those principles are that "[s]ubsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as [an interactive computer service provider] made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline." *Barnes*, 570 F.3d at 1108–09. *Calise* thus set forth a two-part test: "First, what is the 'right' from which the duty springs? If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then § 230(c)(1) does not apply." 103 F. 4th at 742 (citations omitted). Next, "we ask what is this duty requiring the defendant to do? If it obliges the defendant to 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Id.*

Even though Shared now characterizes its claim as contract-based, it challenges Meta's decision to "unpublish" Shared's content from Facebook and seeks to hold Meta liable for its publishing activity. Notably, Shared's complaint makes no reference to terms or policies that Meta purportedly breached, or any promise that Meta made. Nor

do the Terms of Service contain the contractual promise newly asserted by Shared. The relevant language states:

> We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas. If we determine that you have clearly, seriously, or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account.

The surrounding language in the Terms of Service—e.g., Facebook wants users to "express themselves," "share their thoughts and ideas," and not breach "Community Standards"—underscores that this provision is about Facebook's publishing activities. The Terms of Service just restate Meta's ability to exercise editorial discretion. In other words, a contractual promise that reiterates the company's inherent publishing authority still amounts to publishing activity protected by Section 230. *See King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021) ("[A]ll that Facebook did here was to incorporate into the contract (the Terms of Service) its right to act as a publisher."). Indeed, it makes little sense to strip Meta of Section 230 liability defense simply because Facebook articulated its discretion as a publisher in its Terms of Service.

Compare the quintessential publishing activity here to the facts in *Barnes* and *Calise*, where we carved out certain contract-based claims from Section 230 protection. In *Barnes*, Yahoo had expressly promised a specific user that it would remove naked photos that her former boyfriend

posted but failed to follow through on that promise. 570 F.3d at 1099. We held that Section 230 did not bar the user's promissory estoppel claim because Yahoo's one-time promise to a specific user was beyond its typical publishing activity. *Id.* at 1107–09.

And in *Calise*, plaintiffs (who were scammed by Facebook advertisers) alleged that Meta in its Terms of Service promised to "[c]ombat harmful conduct," including removing "content that purposely deceives, willfully misrepresents or otherwise defrauds or exploits other for money or property." 103 F.4th at 736. Because Facebook did not take appropriate action to combat scam advertisements as promised, we held that it triggered a "[c]ontract liability" derived not from any publishing conduct but rather from its breach of a promise in its Terms of Service. *Id.* at 743 & n.5 (citation modified). The promise in *Calise* was not centered on paradigmatic editorial discretion like the relevant Terms of Service here, which allows Facebook to terminate an account if a user violates "Community Standards" such that users do not "feel welcome and safe to express themselves and share their thoughts and ideas." Rather, Facebook in *Calise* promised to curb advertisements that "defraud[] or exploit[]" for "money or property." *Id.* at 736. Such a contractual promise does not sound in editorial discretion but rather represents a business commitment to smoke out scammers.

In sum, a claim does not automatically fall outside the ambit of Section 230's liability protection just because it is framed as a breach of contract. Instead, a court must evaluate a claim to determine whether it seeks to treat an interactive computer service as a publisher or speaker of third-party information. That task may include assessing the core theory of the complaint and the nature of the alleged

injurious conduct. In our case, Shared's claim hinges on Meta's publishing authority, despite being dressed up in contractual garb. Section 230 thus bars Shared's claim.

## CONCLUSION

We **AFFIRM** the dismissal of the conversion claim.